[No. 22709. Department Two. July 1, 1931.]

ALBERT F. SCHOTIS, *Respondent*, v. NORTH COAST STEVE-
DORING COMPANY, *Defendant*, KAWASAKI
DOCKYARD CO., LTD., *Appellant*.[1]

[1]Reported in 1 P. (2d) 221.

306

*Hayden, Merritt, Summers & Bucey,* for appellant.
*Roberts, Skeel & Holman,* for defendant.

*Wm. Martin* and *George F. Vanderveer,* for respondent.

BEELER, J.—This action was brought by Albert Schotis, a longshoreman, against North Coast Stevedoring Company, a Washington corporation, and Kawasaki Dockyard Co., Ltd., a Japanese corporation, to recover for injuries sustained by him in a fall through a hatch of the Japanese steamship "Atlantic Maru" on November 22, 1926, while she was lying at a dock at Seattle. The steamship was owned and operated by the Japanese corporation, and was officered and manned by persons of the Japanese race. Schotis was an employee of the stevedoring company and was one of a gang of longshoremen engaged in unloading cargo from the steamship. He and his fellow workmen were of the Caucasian race.

The action was tried by the court with a jury. The verdict was in favor of the plaintiff against the Japanese corporation, but not against the stevedoring company, and judgment followed accordingly. The Japanese corporation has appealed from the judgment against it, and the plaintiff has appealed from the judgment in favor of the stevedoring company. We shall call the Japanese corporation the appellant and Schotis the respondent.

The appellant has assigned thirty errors, and has discussed them under almost as many headings of the argument, but in the view we take of the appeal we

need not go into so much detail. There are two main contentions that go to the plaintiff's right to recover at all from the appellant, and these will be disposed of first.

The respondent, in his original complaint in this action, alleged that, at the time he was injured, he was in the employ of both of the defendants (the appellant and the stevedoring company) in the capacity of a stevedore and seaman, and that his injuries resulted from their negligence in allowing the hatch into which he fell to remain uncovered, unguarded, and unlighted, and in sending him to work about it without any warning of its condition. He prefaced his complaint with a statement that he elected to maintain the action as one for "damages at law, with the right of trial by jury," under § 33 of the Merchant Marine Act, approved June 5, 1920 (46 U. S. C. A., § 688). This section reads as follows:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."

The appellant in due time appeared generally in the action by demurrer to the complaint and making certain motions against it; and simultaneously the appellant and its co-defendant, the stevedoring company,

petitioned for removal of the case to the United States district court for the western district of Washington, northern division. The petition did not negative the allegation of the complaint that the respondent was an employee of both the appellant and the stevedoring company, nor affirmatively allege otherwise. The removal was sought on the sole ground

". . . that the plaintiff's claim and cause of action, if any, for and on account of said alleged injuries arise under and by virtue of the admiralty and maritime laws of the United States, and, therefore, that said claim and cause of action of plaintiff, if any, constitute a suit of a civil nature, at law, arising under the constitution and laws of the United States."

The petition for removal was presented and argued to one of the judges of the superior court, and was denied. The record was not taken to the Federal court, which alone had power to pass conclusively upon the petitioner's right to remove. The removal was opposed by the respondent upon the ground that it did not disclose any Federal question upon the decision of which the defendant's rights depended, and also upon the ground that the Federal Employers' Liability Act (45 U. S. C. A., §§ 51 to 59), which by reference is made applicable to actions brought under § 33 of the Merchant Marine Act, forbids the removal to a United States court of any such action brought in a state court.

Thereafter, the demurrer to the complaint was sustained. The respondent then filed an amended complaint wherein he alleged that, at the time of his injury, he was in the employ of the stevedoring company alone, and he omitted any expression of an election to maintain the action under § 33 of the Merchant Marine Act. In these respects, the subsequent amended complaints were the same.

The appellant now insists that the respondent, by asserting an election in his original complaint, and by successfully resisting removal on the ground that removal was forbidden by the Federal Employers' Liability Act, irrevocably elected to maintain his action under § 33 of the Merchant Marine Act; and that, since that act applies only to relations between employer and employee, and the respondent was not in fact an employee of the appellant, a recovery herein against the appellant was precluded absolutely.

In the first place, upon the filing of the petition for removal, the record then showed without question that the respondent was an employee of the appellant as well as of the stevedoring company, and in that situation the action on its face was one under § 33, without an express assertion to that effect by the respondent. *Engel v. Davenport,* 271 U. S. 33; *Hammond Lumber Co. v. Sandin,* 17 Fed. (2d) 760. The action in that shape clearly was not removable as to either defendant, because of the inhibition of the statute. *Anderson v. American & Cuban S. S. Co.,* 41 Fed. (2d) 950.

Had the appellant separately petitioned for removal, and by its petition put in issue the allegation that the respondent was in its employ, and shown a separable controversy wherein a right of the appellant would depend upon the decision of a Federal question, the appellant's position now would be altogether different. As it was, the appellant lost nothing by the denial of its petition for removal. The petition was groundless, and apparently was interposed solely for its possible effect in binding the respondent to an election. When the amended complaint was filed, alleging that the respondent was an employee of the stevedoring company only, a possible separable controversy removable to the Federal court appeared for the first time in this action, but the appellant did not then seek removal.

In the second place, the respondent never actually had a remedy against the appellant under § 33 of the Merchant Marine Act, because that act applies only to relations of employer and employee, and the respondent was not in fact an employee of the appellant. His initial assertion of such a remedy was not conclusive. It is elementary that, where one selects a remedy that is not actually available to him, he is not thereby precluded from taking the right course upon discovering his mistake. *Godefroy v. Reilly,* 146 Wash. 257, 262 Pac. 639. And herein lies the distinction between the present case and *Killes v. Great Northern Ry. Co.,* 93 Wash. 416, 161 Pac. 69, and the hypothetical situation assumed in argument in *Baird v. Northern Pacific Ry. Co.,* 78 Wash. 67, 138 Pac. 325.

The other contention of the appellant going to the whole case requires the statement of a few more facts. The steamship "Atlantic Maru" arrived at Seattle from San Francisco on the evening of November 21, 1926, for the purpose of discharging cargo from hatchways No. 1, No. 2, and No. 4, but not any from No. 3, where the respondent fell. The longshoremen, under the stevedoring company, worked the cargo the following day from hatchways No. 1, No. 2, and No. 4, until about 4:15 in the afternoon, when they were finished except for the replacing of the hatch beams on the hatches from which cargo had been taken. No cargo was discharged from hatchway No. 3 during the vessel's stay in Seattle, and the main deck hatch opening remained covered until after the accident. The openings of No. 3 on the under two decks were uncovered, though the beams were in place. The other under deck hatches were in the same condition when the working of the cargo commenced.

When the gang of which the respondent was a member was replacing, or had just finished replacing, the

beams on the shelter deck opening of hatchway No. 4, the respondent, who by that time had put on his heavy outer coat preparatory to leaving the ship, went to hatch No. 3 for some reason, and, the place being dark, stumbled over something and fell down the hatchway to the bottom of the hold. It was his and his witnesses' version of the matter that he was directed by the ship's second officer to go to hatch No. 3 for dunnage (a board or something similar) wherewith to pry up a hatch beam at No. 4 preparatory to lifting it into place.

The evidence of the appellant tended to show that no dunnage was needed or was called for at No. 4 hatch, and that, if any had been needed, there was plenty right at hand in the wings; that the respondent was not directed and had no occasion in the pursuit of his work to go to hatch No. 3, but went solely for a reason personal to himself; and that he was thoroughly familiar with the conditions at No. 3, knowing that it was uncovered, unguarded, and unlighted and that there was, or was likely to be, more or less debris around it. There were one hundred cases of canned crab meat (a part of the cargo) stowed on the shelter deck near this hatch, and there was evidence that a small can of crab meat out of this lot was found lying near the respondent in the hold after his fall, and that several cans were in his pockets when he was taken from the ship to the hospital.

We are asked by the appellant, in view of the foregoing, and of all of the evidence, to hold that the respondent is not entitled to recover. This we cannot do as a matter of law, for there were questions of fact to be determined, and there was some evidence to support the respondent's version of what occurred. Whatever we may think of the evidence, and of the facts proved by it, is quite immaterial, for it is not our function to weigh conflicting evidence and determine facts in a

jury case. We are constrained to hold that the case was for the jury, and that the arguments now pressed upon us in respect to this feature of the case were for the trial court to consider upon the motion for a new trial.

Turning now to the other assignments of error, we find two that are sufficiently grave to require a new trial. The first is the refusal of the trial court to admit in evidence certain pleadings of the respondent in this and two prior actions for the same cause.

Shortly after his accident, the respondent and his wife libeled the "Atlantic Maru" in the United States district court for the district of Oregon at Portland, for the damages sought to be recovered in the present action. From the libel and amended libel (both of which purport to allege facts in some detail and are not formal merely), it is fairly inferable that it was the intention of the libelants to make it appear that the libelant Albert F. Schotis was in the employ of the ship, though there was no express averment to that effect, nor that any order or direction was given him by any officer of the ship. The stevedoring company was not a party to the suit, nor was it mentioned in the libels. That suit was dismissed January 16, 1928, at the instance of the libelants.

On September 10, 1927, the respondent and his wife filed in the superior court for King county their complaint in an action at law for the same cause against the stevedoring company and the appellant and another Japanese corporation. The complaint contained an allegation that the respondent, at the time of his injury, was in the employ of all of the defendants, but there was no allegation that any order or direction was given the respondent by any officer of the ship. The cause as against the alien corporations was removed to the United States district court for the western dis-

trict of Washington, northern division, where it was retained as a separable controversy. *Schotis v. North Coast Stevedoring Co.*, 24 Fed. (2d) 591, 1928 A. M. C. 92. Presumably the action in both courts was later voluntarily dismissed.

In the present action, the original complaint alleged employment by both the appellant and the stevedoring company; the amended complaint, the second amended complaint, and the third amended complaint did not. In the third amended complaint, upon which this action was tried, appeared for the first time an express allegation that an officer of the ship had given the respondent orders and directions. Paragraph VI reads as follows:

"That at said time and place Neal Blegen was the foreman employed by the North Coast Stevedoring Company; and J. Taniguchi was the second officer of and upon the said steamship 'Atlantic Maru' and employed by the defendant Kawasaki Dockyard Co., Ltd. (Kabushiki Kaisha Zosenjo), and under whose orders and directions the plaintiff worked while being employed upon said vessel."

In Paragraph VII, it is alleged that the respondent was "proceeding necessarily and carefully *under the directions of the said J. Taniguchi*" when he tripped over some loose obstacle in the darkness and fell into the open hatchway. Paragraph VI and the italicized words just quoted had not appeared in any previous pleading, nor had there been any other allegations of similar import.

The appellant was entitled to have all of the complaints in this case and the complaint in the former action in the superior court and the two libels in the admiralty suit admitted in evidence. There were palpable inconsistencies in them which the appellant had a right to have the jury consider, even though it

seemed likely that the respondent might have some reasonable explanation for some or all of them. Especially was the appellant entitled to have the jury consider, as a tacit admission against interest, and in support of Taniguchi's testimony, the failure of the respondent and those acting for him to allege in any pleading until the last that Taniguchi had given the respondent the order or direction that led him to go to the place where the accident occurred. *Kiefer v. Lara,* 56 Wash. 43, 104 Pac. 1102.

It is suggested that the libels and the complaint in the former action in the superior court were not admissible because they were not verified by the respondent, but by his wife, who was a co-libelant and a co-plaintiff. It appears clearly, however, from those earlier pleadings, and from the testimony at the trial, that those who were acting for the respondent when the pleadings were drafted had access to original sources of information, probably more trustworthy then than later, from which they could have learned all of the facts bearing upon the appellant's responsibility for the accident.

The appellant claims misconduct of one of the attorneys for the respondent in appealing to religious and race prejudice in his argument to the jury. In his closing argument he said:

"The reason they uncover those hatches is because it saves time and time is money, and that brings me to the three Japanese. They don't like us because they can't be citizens, because they can't—they don't like us because they can't even rent land in this state, at least. And the reason they can't do it is because we don't like their ways of living and we decline to degrade our people to the plane on which they live, where women and children go out and dig potatoes and work in a garden to support a family.

"Now, it is not at all out of place for me to say Japanese people don't like us, and we don't like them, because it is just a plain fact that you all know. We passed laws against them. They protested. They threatened this and threatened the other about it and had all sorts of international complications about it. The fact is, we don't like them—they are just different. They have got different ways of thinking about us. They don't believe in the same God we believe in, and yet they stood up here and swore before God,— MR. SUMMERS: (interrupting) If Your Honor please, I take exception to the remarks of counsel. I think they are prejudicial. I think nothing justifies the remarks he has made respecting the sanctity of the oath taken by them. I don't think he has any— MR. VANDERVEER: (interrupting) That is the oath they took. That is an oath that has no binding effect on their— THE COURT: Counsel will confine his argument to the evidence in the case and the jury will disregard all the argument not based upon the evidence. MR. VANDERVEER: There are certain matters of common knowledge we don't introduce evidence upon. THE COURT: The court has ruled. MR. VANDERVEER: O don't— MR. SUMMERS: I renew my exception. MR. VANDERVEER: Be the fact as it may, you know, a court room is a place to discuss facts and not evidence and not religion, as His Honor has ruled, but anyway, even if it is distasteful, a fact is a fact and I still affirm we don't like Japanese and they don't like us. I don't know how it affects the testimony of these Japanese. Let me call your attention to this: four of them, at least, were down in that hold, because they took their depositions,—four of them said so. The second officer testified and said he went down, the apprentice officer testified and the ship's carpenter testified he went down, and the store keeper testified that he went down, and how many went down, or how many more went down, I don't know, but I know this: We have tried this case three times. Fifty thousand dollars is, while not a lot of money, is quite a lot of money compared with the amount of the Japanese time where they pay a few cents a day wages. But wild horses have never been able to get one of those men before a jury where they could look them in the face

and where they could be cross-examined. They took their depositions in Portland, yes, and afterwards here, but in all three trials we have never been able to get one inside of a court room, not if we go on trying this for the next five years will we get one to look at the jury. Taken in the form of depositions. Taken— people on the witness stand are different, always.''

''And then I say again, it isn't in the log book, yet that was their big defense. It isn't in the log book, my friends. It is all true with Japanese. Well, I have been prosecutor in my life in this town for a good while. I know this: if you have done anything, if you have done anything such as I believe some one of these Japanese or more of them did, you don't run around telling anybody about it, you don't point it out, you stand aside cowardly waiting for the discovery to be made, because they have done their work in such a way it is bound to be made.''

''My friend seemed to stop at nothing, however, in his attempt to vindicate his Majesty's client, and degrade the witnesses who dared to testify against them. He said maybe those other longshoremen went down there and they took those four missing cans and maybe that is what they had for lunch. That is all the way through this whole argument, the theme ran like a thread through a piece of cloth,—they are all liars and don't believe them, because they are this man's friends. Maybe so—maybe so, I don't know, but thank God I am white, thank God I have a fair decent amount of respect for the opinion and testimony of white people. At least, they swore before God to whom they stand in some future fear when they testified.''

It will be seen from these excerpts that the appeals to racial and religious prejudice were repeated and persistent, and were continued after objection, and after counsel had been cautioned by the court. What was said by this court in *McSweyn v. Everett,* 136 Wash. 202, 239 Pac. 205, may aptly be said here:

''The pleadings presented a case of importance. Each party was entitled to a fair and impartial trial according to the established rules of judicial procedure.

A trial in a court of justice should be on the merits. This case was well tried and the rule of fairness observed until violated by the course complained of against the city attorney. There is nothing in the record to suggest, nor any claim in the argument on behalf of the city, that the conduct complained of was defensive of any provocation on the part of the appellant. However intelligent, impartial and honest jurors may be, they, of course, find it difficult to decide correctly and fairly the complicated questions of fact submitted to them in a law suit, without their being influenced and disturbed by that which naturally appeals to passion and prejudice.

"We are not called upon nor are we considering and deciding a case of a single breach, nor any number less than repeated and persistent indulgences in appeals to prejudice, in defiance of the record and caution of the trial court. It is the cumulative effect of improprieties that is involved. They were grave departures from the rule of a fair and impartial trial that could be attempted to be overcome only by the sometimes dangerous expedient or method of constant objections by counsel in the presence of the jury, and admonitions by the court. There are cases which hold, under the particular circumstances of such cases, that because of the recognized and admitted intelligence of jurors, immediate caution by the court is supposed to remedy the evil effects of such appeals. On the contrary, there are cases, not inconsistent with the kind just referred to, which state that the difficulty with remarks of that kind frequently repeated is that one by one they will locate a feeling in the minds of the jury it is impossible to eradicate [citing cases]. In nearly all of the cases just cited it was held that the misconduct complained of constituted reversible error, notwithstanding the denial by the trial court in each case of a motion for a new trial."

And just as apt is the following comment of the supreme court of Indiana in *Rudolph v. Landwerlin,* 92 Ind. 34:

"It does not necessarily follow, because the court upon the trial did its duty, that there has been no avail-

able error. If there was an irregularity in the proceedings of the prevailing party, through the misconduct of his attorney in argument, by which the other party was prevented from having a fair trial, and such irregularity was not waived, but was objected to on the trial for good reasons stated at the time, and was assigned as a cause in a motion for a new trial, the overruling of such motion is an error for which the judgment may be reversed.

"Very many abuses in argument may be sufficiently corrected by the instructions of the court to the jury, and a large discretion as to the refusing of new trials because of such violations belongs to trial courts, and this court will not interfere because of an abuse in argument which was sufficiently counteracted by the action of the trial court in the premises; but it will interfere where, notwithstanding the efforts of the trial court to correct the abuse, the irregularity appears to be such as to prevent a fair trial, and the particular circumstances of each case will guide this court to its decision.

"In the case before us, if the first departure of counsel might have been rendered harmless, the second outbreak could not have been inadvertent, but was without any excuse, and it can only be regarded as a purposed violation of the admonition of the court and an attempt to gain an advantage in a court of justice by a known wrong."

It is our decision that, because of the exclusion from evidence of the pleadings heretofore mentioned, and because of the misconduct of counsel in appealing to religious and race prejudice before the jury, a new trial must be had.

Besides the errors above discussed, there were certain minor ones, which probably would not require a reversal, but which we deem it proper to mention in order that they may not occur at another trial.

 The court permitted respondent to read in evidence Rule 9, of subd. 17, § 39, of the rules and regulations of the United States department of commerce ap-

plicable to American vessels. The rule relates to the duty of masters to see that hatches are closed before proceeding to sea. It had no application to the Japanese vessel, "Atlantic Maru", nor to any vessel lying in port discharging cargo, and it ought not to have been admitted.

A physician testifying for the respondent volunteered the information that he had been called to attend the respondent by a physician representing an insurance company, by which a part of his bill might or would be paid. We are satisfied that the respondent's counsel was in no way responsible for this lapse, but it would seem that on another trial a repetition of the occurrence could easily be avoided.

■ The appellant's requested instruction No. 15, which was refused, read as follows:

"If you find at the time plaintiff was injured no work was being done or to be done at the No. 3 hatch, and there was no occasion, reasonably to be expected by defendant steamship company for plaintiff to go there in the course of his employment or duties, and if you find that plaintiff was not directed or instructed to go toward said No. 3 hatch by Taniguchi, the second officer of the vessel, then you are instructed that the steamship company was under no obligation or duty to make any conditions at or about said No. 3 hatch safe, and your verdict must be for the defendant steamship company."

This instruction or one of similar import ought to have been given.

■ The court's instruction No. 10, charged the jury correctly on the assumption of risk as between the respondent and the stevedoring company. A similar instruction suited to the relation between the respondent and the appellant ought to have been given. *Hogan v. Metropolitan Building Co.*, 120 Wash. 82, 206 Pac. 959; *Bullivant v. Spokane*, 14 Wash. 577, 45 Pac. 42.

The appellant requested instruction No. 18 on this point, which, however, also covered other matters, and for this reason was not suitable. At another trial, the stevedoring company will not be present, and there ought to be no difficulty in framing a simple concise instruction that will put before the jury clearly the appellant's defense based on the doctrine of *volenti non fit injuria.*

■ The appellant requested and the court refused the following instruction (No. 28):

"You are instructed that hatchways are well-known features and sources of danger on a ship. They are intended to be open a large portion of the time, especially when in port, not only for the purpose of loading and unloading cargo, but also for ventilation. An open hatchway on a ship, when provided with the usual coamings, is not evidence of a neglect of duty on the part of the shipowner. On the contrary, a shipowner has the right to allow the hatchways of his ship to remain uncovered and unprotected, except by the usual coamings; and an experienced longshoreman used to working on board ships, who proceeds along the shelter deck of a vessel, is chargeable with notice of the probable presence of an open hatchway therein."

This requested instruction states the law applicable to the situation shown in this case and it ought to have been given. *The Carl,* 18 Fed. 655; *The Gladiolus,* 22 Fed. 454; *The Saratoga,* 94 Fed. 221; *The Auchenarden,* 100 Fed. 895; *The Indrani,* 101 Fed. 596.

■ The court gave the following instruction (No. 12):

"I instruct you that an employee has a right to rely upon the superior knowledge and judgment of his superiors. If he is ordered by a superior to do a certain thing the order is in itself an assurance of safety upon which he has a right to rely unless he either knows, or by the exercise of reasonable care should know, the dangers involved in obeying such order. Applying

this principle to the case at bar, if you find by a fair preponderance of the evidence that the second officer of the "ATLANTIC MARU" was directing the work of placing the hatch beams at the No. 4 hatchway and in the course of so doing directed the plaintiff to go forward and get some dunnage to be used in raising one of the beams, then the plaintiff would have a right to assume that he was in no danger in obeying said order other than the dangers which were open, obvious and apparent or such as would be observable by him while exercising reasonable care or caution for his own safety."

This was a correct statement of the law as between master and servant, but it was inapplicable as between the respondent and the ship's second officer, who was not the respondent's master or superior, and whom the respondent was under no duty or coercion to obey.

We come now to the respondent's appeal from the judgment in favor of the stevedoring company. Only two errors are alleged, viz., the giving of the following instructions:

"No. 14. In the first instance the duty of making and maintaining a vessel reasonably safe for stevedoring operations is on the steamship company, and the stevedoring company when it sends its men aboard a vessel has the right to assume that the owner or operator has not failed in that duty. In the absence of anything to excite suspicion or to suggest the existence of a dangerous or unsafe condition arising from the failure of the ship owner or operator to make a vessel reasonably safe, a stevedoring company is under no obligation or duty to make a minute inspection nor to search for dangerous conditions. In such a case, however, it is the duty of the stevedoring company to exercise reasonable and ordinary care to inspect the place or parts of the vessel where the duties of the longshoremen employed by it would probably require them to go.

"No. 15. You are instructed that you cannot return a verdict against the stevedoring company unless you also find against the steamship company."

The latter instruction, No. 15, while erroneous, proved to be harmless, because the jury did find against the steamship company.

The second sentence of instruction No. 14 was inappropriate, because the unsafe condition, if it was unsafe, which resulted in the respondent's accident was not latent and would have required no minute inspection to discover. But this part of the instruction could not have been prejudicial. There was no evidence to put upon the stevedoring company the responsibility for the respondent's going to Hatch No. 3, on the shelter deck. No cargo was expected to be, or was in fact, discharged from that hatchway, and it was not so located that the men would have any occasion to be about it in their work or to pass it in going to or from their work. The sole reason assigned by the respondent for his going there was that the second officer of the ship told him to go in that direction to get dunnage.

The judgment is affirmed as to the stevedoring company, but as to the appellant, the steamship company, it is reversed and remanded for a new trial.

MITCHELL, MILLARD, and FULLERTON, JJ., concur.

BEALS, J. (dissenting in part)—I concur in the foregoing opinion, save in so far as the same holds instruction No. 12 as given by the court objectionable. In my opinion, the court did not err in giving this instruction.