[No. 31689. Department One. November 23, 1951.]

MARGARET CARFA, *Appellant*, v. RALPH E. ALBRIGHT, *Individually and as Administrator, Respondent.*[1]

*Lawrence H. Brown* and *Lloyd E. Gandy*, for appellant.

*Joseph A. Albi*, for respondent.

FINLEY, J.—This action was brought by Margaret Carfa, appellant, under Rem. Rev. Stat. (Sup.), § 784-1 [P.P.C. § 65-1] *et seq.* She claims that she is the daughter of

[1] Reported in 237 P. (2d) 795.

Agostino Carfa (deceased), and that she is entitled to one half of his estate. After Carfa's death, Ralph Albright apparently learned for the first time that the deceased was his father. Ralph was appointed administrator. He claims he is the sole heir of Agostino Carfa and that he is entitled to the entire estate. The trial court found that Ralph was the sole heir of the deceased and awarded the entire estate to him. Margaret Carfa has appealed.

The facts are somewhat involved, to say the least. We regard as pertinent the following: In March, 1921, Agostino Carfa married Mary Lambert. A son, Ralph, was born. Shortly thereafter, there was a divorce. Mary Lambert, the mother, took the child. In 1925, she married Harry Albright. The child Ralph was not adopted by the stepfather, but was raised by the Albrights as their own child.

Emily Burreli and Agostino Contabile were married around 1921. They had two children, Johnny and Eleanor. They were divorced on March 2, 1926. Contabile was given the custody of Johnny and Eleanor. In April, 1927, Emily and Contabile remarried. Contabile testified that he and Emily lived together for eight or nine months during the interim between their divorce and their remarriage. This appears to have been in Kellogg, Idaho. Carfa was also a resident of Kellogg, Idaho, at that time and apparently was well acquainted with Emily, to say the least, and perhaps with Contabile.

About four months after Emily's second marriage to Contabile, she gave birth to a third child, Margaret Carfa, at the home of Emily's mother in Spokane. Apparently, the child was conceived in November, 1926, at which time Emily was not married.

Two months after Margaret's birth, Emily initiated divorce proceedings at Wallace, Shoshone county, Idaho. Johnny, Eleanor, and Margaret were mentioned in Emily's complaint. Contabile cross-complained. He alleged illicit relations between Emily and others, naming in particular Gus Carfa. The alleged relations involving Carfa referred to specific dates after the birth of Margaret. Contabile

asked for the custody of Johnny and Eleanor, "the said children being the issue of the said marriage." Emily defaulted; Contabile was awarded a divorce and custody of Johnny and Eleanor.

On March 30, 1928, Emily started a family desertion proceeding in Spokane. She sought to compel Contabile to aid in the support of Margaret. On August 6, 1928, pending appeal in this action from the justice court, *Emily married Carfa.* (Before proceeding further with the facts, we note and emphasize here that, if Carfa finally should be held to be Margaret's father, under Rem. Rev. Stat., § 8442 [P.P.C. § 733-17], his marriage to Emily would legitimatize Margaret.) The family desertion proceeding was dismissed in October, 1928, apparently on two grounds: (1) that Contabile was supporting Johnny and Eleanor in accordance with the Shoshone county, Idaho, divorce decree; and (2) because Emily had married Carfa, and Emily and Margaret were residing outside of the jurisdiction of the court.

Emily died in 1932. Thereafter, Margaret lived with her grandparents in Spokane, except for an occasional summer spent with Gus Carfa. Margaret testified that she always regarded Carfa as her father, and that he supported her until she finished school and was able to work. It is undisputed that she saw Carfa frequently during his last illness. Carfa named her as beneficiary of his war bonds, as his daughter and beneficiary in an application for life insurance, and as his daughter in several income tax returns. There was no evidence as to any official registration of Margaret's birth, but there was evidence that, about eight months after Emily married Carfa, Margaret was baptized as the child of Contabile and Emily.

Certain evidence was offered, objected to, and excluded as being hearsay. It was to the effect that Emily, some time around the birth date of Margaret, had stated (1) to a member of her family, and (2) at another time to a friend or neighbor, that Carfa was the father of Margaret. Also excluded was testimony of Minnie Stevens respecting a conversation with Carfa in which he was supposed to have

discussed the terms of a contemplated will and Minnie, at his request, was supposed to have made written notes regarding the contemplated will provisions. By these, Carfa's estate was to go to appellant, *as his daughter*; one dollar was to be given to Carfa's son, if alive. It is not clear whether this latter evidence was offered to show written acknowledgment by Carfa that he was the father of appellant, or to prove the probable making of a will.

■ In deciding this case, the trial court was faced with the *case law* presumption that Margaret was the child of Emily and Contabile. In the case of *In re the Adoption of a Minor*, 29 Wn. (2d) 759, 760, 189 P. (2d) 458, we said:

"While there is a strong presumption that a child born during wedlock is legitimate, that presumption is rebuttable." *Pierson v. Pierson*, 124 Wash. 319, 214 Pac. 159; *State ex rel. Bentley v. Frenger*, 158 Wash. 683, 291 Pac. 1089; annotations 128 A. L. R. 713.

With the exclusion of the proffered testimony referred to above, appellant's evidence was not as convincing as otherwise it might have been to rebut the presumption that Margaret was the daughter of Contabile. If the excluded testimony had been admitted and considered by the trial court, a different result might have been reached.

■ One of the oldest exceptions to the hearsay rule is the family history or pedigree exception. As Justice Woods said in *Fulkerson v. Holmes*, 117 U. S. 389, 397, 29 L. Ed. 915, 6 S. Ct. 780:

"This exception has been recognized on the ground of necessity; for, as in inquiries respecting relationship or descent, facts must often be proved which occurred many years before the trial, and were known to but few persons, it is obvious that the strict enforcement in such cases of the rules against hearsay evidence would frequently occasion a failure of justice."

Included within this exception are declarations of deceased parents as to a child's legitimacy, illegitimacy or paternity. 5 Wigmore on Evidence (3rd ed.) 316, § 1492; 7 Am. Jur. 646, § 27; 10 C. J. S. 33, § 5; *Kotzke v. Kotzke's Estate*, 205 Mich. 184, 171 N. W. 442; *Geisler v. Geisler*, 160

Minn. 463, 200 N. W. 742. To be receivable, in the traditional phrase, the declarations must have been made *"ante litem motam"* (at a time when declarant had no motive to distort truth), and not in anticipation of litigation or contest depending upon the family relationship. *Osborne v. Ramsay,* 191 Fed. 114; 5 Wigmore on Evidence (3rd ed.) 298, § 1483. When the declarations are made prior to the controversy, an underlying principle of the exception to the hearsay rule—that of trustworthiness—is satisfied. Another applicable basic principle is that of necessity. Where the evidence offered is the declaration of an individual member of the family, this hearsay testimony is permissible on the basis of necessity, but only when it is impossible to procure the declarant himself as a witness. The declarant must be shown to be unavailable, either by decease or otherwise. *Northern Pac. R. Co. v. King,* 181 Fed. 913; *State v. Miller,* 71 Kan. 200, 80 Pac. 51.

■ Although the *declarant* must have been (1) a member of the family, or (2) a person "who from living in habits of intimacy with the family or from other peculiar circumstances" would be likely to have known the facts concerning which his declaration is offered (*Westfield v. Warren,* 8 N. J. L. 249), there is no such requirement regarding a *witness* on the stand who merely repeats the declarations. 5 Wigmore on Evidence (3rd ed.) 310, § 1490.

"It was early ruled in England that where the relationship claimed and to be testified to is that of an *illegitimate* child, the *father's relations* are not qualified declarants, because (apparently) the claimant is legally not of the declarant's family." 5 Wigmore on Evidence (3rd ed.) 315, § 1492; "1863 *Crispin v. Doglioni,* 3 Sw. & Tr. 44," 5 Wigmore on Evidence (3rd ed.) 315, note 1.

■ Upon this formulation, not only declarations of relatives of the putative father but a putative father's own personal declarations of illegitimacy would also be inadmissible. However, such esoteric and unreal theorizing has now been disapproved in favor of a more pragmatic approach even in England. "1879 *Murray v. Milner,* L. R. 12

Ch. D. 849," 5 Wigmore on Evidence (3rd ed.) 315, note 2. It is our opinion that the later modification of the rule should be followed; that significant declarations of the putative father or his relatives should not be ruled out because of inherent moral or ethical inhibitions or considerations.

It is one thing if the testimony of Minnie Stevens, which included a statement by Carfa to the effect that Margaret was his daughter, was offered to prove the probable making of a will. On the other hand, it would be another thing if this evidence were offered on the question of paternity. In the latter instance, the evidence would be admissible under the above mentioned rule respecting declarations, family history, or pedigree.

█ We believe that the excluded testimony as mentioned above should have been admitted under the family history exception to the hearsay rule. Its exclusion constituted prejudicial error. Appellant is entitled to a new trial, and it is so ordered.

SCHWELLENBACH, C. J., HILL, and DONWORTH, JJ., concur.

February 29, 1952. Petition for rehearing denied.