[No. 39316.    En Banc.    April 10, 1969.]

PHILIP J. NORDSTROM, *Appellant,* v. WHITE METAL ROLLING AND STAMPING CORPORATION *et al., Respondents.*\*

*\*Reported in 453 P.2d 619.

Harry J. Scharnikow and McMullen, Brooke, Knapp & Grenier, by Robert E. Brooke, for appellant.

Horswill, Keller, Rohrback, Waldo & Moren, by David Hiscock, for respondents.

ROSELLINI, J.—The plaintiff was injured when he fell while climbing a ladder which was manufactured by the defendant White Metal Rolling and Stamping Corporation and sold to him by the defendant Fuller Paint Stores, Inc. Contending that the ladder had collapsed under him, he sued these two on the theories, respectively, that the product was negligently designed and manufactured, and that a warranty of fitness had been breached. The jury before which the case was tried found in favor of both defendants.

On appeal, the plaintiff assigns error to the admission of certain evidence. The first assignment is as follows:

> The Court erred in admitting, over objection, testimony that the ladder purchased by Appellant and manufactured by White Metal Rolling and Stamping Corporation met and exceeded the safety standards set up by the American Standards Association for Metal Portable Ladders and erred in admitting, over objection, Exhibit 17 which was a Copy of the American Standard Safety Code for Portable Metal Ladders.

While error is assigned to the admission of exhibit 17, this exhibit was in fact excluded by the trial court. The plaintiff asserts that the "admission and later rejection" of this exhibit constitutes incurable error, but he offers no argument in support of the statement that the error was incurable. Our examination of the record, however, reveals that there was considerable testimony about this exhibit and certainly its importance was indelibly im-

planted in the minds of the jury. We will therefore assume that the error, if any, was incurable.

The evidence which went to the jury was testimony of witnesses for the defendant White Metal Rolling and Stamping Corporation describing generally the composition of the American Standards Association and the purpose of the publication of exhibit 17, and declaring that the standards set forth therein were met and exceeded by the defendant manufacturer. The trial court instructed the jury in regard to this testimony as follows:

> Evidence was admitted during the trial concerning the American Standard Safety Code for Portable Metal Ladders. You are instructed that this "Code" is not a compilation of rules, regulations or laws of any governmental division and that the provisions of the Code do not have the force or effect of law. Noncompliance or compliance with the provisions of this Code is not of itself either negligence or lack of negligence as a matter of law. You may consider the evidence of the Code only in connection with other evidence bearing upon the question of negligence.

No error having been assigned to the giving of this instruction, it is the law of the case.

According to the law, as stated in the instruction, the code published by the American Standards Association was relevant on the question of negligence, although compliance or noncompliance with it was not in itself determinative of that question. The plaintiff nevertheless contends that this relevant evidence was inadmissible because it was hearsay. He says:

> The general objection that is made to safety codes being used in cases of this kind is that such codes express opinions and they are not given under oath with any opportunity for cross-examination. They also deal with the controversial and developing subjects in which opinions over the years may change. In this case, the safety code for ladders that was admitted in evidence was over ten years old at the time of this trial.

The answers to such objections and the criticisms of the general rule of exclusion have been stated by many

writers[1] and are summed up by Professor Wigmore in his treatise on Evidence.[2] The purpose of the hearsay rule is, basically, to exclude untrustworthy evidence which may prejudice a litigant's cause or defense. It is the inability to cross-examine the author of a publication, when its contents are offered as proof of a fact in issue, which renders the publication objectionable. However, there are many publications which have attributes which, common experience tells us, render them as trustworthy as any evidence given by a witness who has successfully withstood cross-examination.

---

[1] *See,* for examples, H. Philo, *Use of Safety Standards, Codes, and Practices in Tort Litigation,* 41 Notre Dame Lawyer 1 (1965); Note, *Admissibility of Hearsay Based on Trustworthiness and Necessity,* 13 Stan. L. Rev. 945 (1961); Callahan & Ferguson, *Evidence and the New Federal Rules of Civil Procedure,* 47 Yale L.J. 194, 204-7 (1937); Newton, *The Admission of Printed Material as an Exception to the Hearsay Rule,* 19 Baylor L. Rev. 280 (1967); *see also,* McCormick, *Hearsay,* 10 Rutgers L. Rev. 620, 630-31 (1956); Harum, *Research Evidence and the "Hearsay" Rule,* 39 Fla. B.J. 419 (1965).

[2] The questions of trustworthiness and necessity are discussed in 5 J. Wigmore, Evidence, § 1420, at 202-03 (3d ed., 1940), under the heading, "Principle of the Exceptions to the Hearsay Rule," wherein the author states:

The purpose and reason of the Hearsay rule is the key to the Exceptions to it.

The theory of the Hearsay rule (*ante,* § 1362) is that the many possible sources of inaccuracy and untrustworthiness which may lie underneath the bare untested assertion of a witness can best be brought to light and exposed, if they exist, by the test of cross-examination. But this test or security may in a given instance be superfluous; it may be sufficiently clear, in that instance, that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation. Moreover, the test may be impossible of employment—for example, by reason of the death of the declarant—so that, if his testimony is to be used at all, there is a necessity for taking it in the untested shape.

These two considerations—a Circumstantial Probability of Trustworthiness, and a Necessity, for the evidence—may be examined more closely, taking first the latter.

(1) Where the test of cross-examination is *impossible of application,* by reason of the declarant's death or some other cause rendering him now unavailable as a witness on the stand, we are faced with the alternatives of receiving his statements without that test, or of

If a publication is produced by persons or groups having special knowledge regarding the subject under discussion, and having no motive to falsify, but having rather every reason to state the facts as they are known to the author or authors, subjecting them to cross-examination would be a superfluous activity. Furthermore, where a publication is produced by a great number of persons, or where one or more of the authors has died, the publication must either be admitted without putting the authors on the witness

leaving his knowledge altogether unutilized. The question arises whether the interests of efficient investigation would suffer more by adopting the latter or the former alternative. Whatever might be thought of the general policy of choosing the former alternative without any further requirement, it is clear at least that, so far as in a given instance *some* substitute for cross-examination is found to have been present, there is ground for making an exception. The mere necessity alone of taking the untested statement, instead of none at all, might not suffice; but if, to this necessity, there is added a situation in which some degree of trustworthiness more than the ordinary can be predicated of the statement, there is reason for admitting it as not merely the best that can be got from that witness, but better than could ordinarily be expected without the test of cross-examination. We thus come to consider the second essential element.

(2) There are many situations in which it can be easily seen that such a required test would add little as a security, because its purposes had been already substantially accomplished. If a statement has been made under such circumstances that even a skeptical caution would look upon it as trustworthy (in the ordinary instance), in a high degree of probability, it would be pedantic to insist on a test whose chief object is already secured. Supposing that such a situation exists, the statement could properly be received, especially if no other evidence from that person was now available. The law of evidence properly assumes that such situations can and do exist, and the exceptions to the Hearsay rule are concerned with defining them.

A perception of these two principles and their combined value has been responsible for most of the Hearsay exceptions. Each exception, to be sure, has come into existence and been maintained independently and amid considerations peculiar to itself alone. There has been no comprehensive carrying-out of a system of principles. Yet the results may be coordinated under those two heads. There has rarely been any judicial summing-up of the principles; yet their existence has been fully perceived and often judicially stated.

(Footnote omitted.)

stand, or the valuable evidence contained therein must be lost.

Thus, where evidence of the contents of a publication must be admitted if the relevant and material information contained therein is to be made available to the trier of the facts, and the publication is one which reasonable minds would agree is trustworthy, there appears to be no sound reason why such evidence should be excluded. The purpose of the hearsay rule is not offended by the introduction of such evidence.

The trustworthiness of exhibit 17 was established beyond any reasonable cavil. It was published after thorough research by a special committee assigned to study appropriate standards for construction, care and use of ladders, a subcommittee of which did the research on metal ladders. The personnel of the committee represented interested manufacturers, consumers (represented by such organizations as the American Federation of Labor, the Associated General Contractors of America, the American Association of Railroads, and the International Association of Fire Fighters), professional groups (such as the American Society of Mechanical Engineers and the American Society of Safety Engineers), associations of insurance companies, agencies (such as the United States Department of Agriculture, the United States Department of Labor, the Bureau of Standards, and the Department of the Army, Corps of Engineers (Liaison)), and the National Safety Council. A total of 23 organizations was represented. If objectivity was not established by this representation of interested parties, the lack of such objectivity could presumably be demonstrated by the plaintiff. He did not seriously challenge it, however, and the trial court should have had no difficulty in deciding that the code was trustworthy. A motive to falsify could hardly survive in such a diversified group; and the pertinent facts on which to base a code of standards were within the knowledge of the participants. This code was promulgated before the facts giving rise to this litigation occurred; and it was not drawn with a view to favoring the position of a manufacturer in this or any other litigation.

The other factor which Wigmore mentions, that of necessity, is also present. The code is relevant, and it is material to the manufacturer's defense, but those who prepared it are not available to testify. The participants are too many in number and too widely scattered. It would be highly impractical, if not impossible, to gather them together to testify at the trial, and it is doubtful if their testimony would add anything to the trustworthiness which is imported by the circumstances under which it was prepared. It is not suggested that the code offered in evidence was a forgery. Thus the elements of trustworthiness and necessity, which form the basis for any exception to the hearsay rule, are present.

■ However, the plaintiff says that a code of this type is open to criticism because it represents a mere expression of opinion upon a controversial and developing subject on which opinions may change over the years. The fact that scientific knowledge on a particular subject may not be complete is no reason to exclude evidence of whatever knowledge may be available. Otherwise, expert opinions on scientific matters would never be admissible. And the fact that a witness may not be informed as to the latest developments will affect the weight to be accorded the expert's testimony or the particular publication offered, but it does not render the evidence altogether irrelevant or incompetent.[3]

---

[3]Professor Wigmore discusses this theory in that portion of his work devoted to the question of the admissibility of learned treatises, among which he includes safety codes. (*See* 6 J. Wigmore, Evidence, § 1698 (3d ed., 1940, Supp. 1964), at 8.) In volume six of the third edition, section 1690, he says:

(2) We have been told that *Science is shifting;* that experiment and discovery are continually altering scientific theories and rendering them valueless; so that "a medical book which was a standard last year becomes obsolete this year"; that there is no general agreement among scientists, and that testimony characterized by such instability and uncertainty is untrustworthy.

There is ignorant exaggeration in these charges. They attribute to the entire body of scientific knowledge the instability due to casual rapid progress in certain departments of the sciences; and they ignore even in those departments the small proportion which

The validity of this approach to the question is illustrated in the circumstances of this case. While the plaintiff points a finger of accusation at all safety codes, as being mere expressions of opinion and not necessarily reflecting current opinion, he offers no evidence that the code in question does not represent the latest and best thinking on the subject

the field of possible change bears to the large area of established truth. But, leaving this aside, we find that the objection is in itself inconsistent with accepted legal practices, and would if consistently applied exclude all testimony even on the stand from scientific witnesses. For if these works are rejected because they may not embody the latest results of science, what shall be said of specialist witnesses in general? Out of the hundreds of scientific experts who are this month testifying in courts of justice, how many are speaking from a thorough acquaintance with the latest researches in their subjects? For how many of them is it possible to maintain steady pace with the daily progress of science? How many are not testifying on information obtained at a medical or other technical school a decade or more ago, in the standard books of that day? It is true, where conflicting views are advanced and an expert cannot state his views to be founded on the most recent investigations, that his views are naturally entitled to inferior weight; but could it seriously occur to any one to exclude all experts from the stand, not because this or that one has in fact no acquaintance with the recent literature of his profession, but because many among the whole body *may* not possess such acquaintance?

Yet after all, going back to the exaggeration involved, is the objection one of appreciable magnitude? "I will not sit here," once said Chief Justice Dallas, "and hear science reviled and the recorded researches of the medical world misrepresented as leading only to uncertainty." Is there in fact such a conflict of beliefs and theories as Courts must take notice of, to the exclusion of these works? It is safe to say that for practical purposes, in legal controversy, the uncertain topics are the exception and not the rule. If we can imagine a proposal to exclude a given witness to an event because possibly some other person was present, who possibly would relate a different version, which possibly would be more correct, we shall have some analogy to the true force of this objection.

In short, if witnesses had never contradicted each other and experts on the stand had never differed, it might be urged with some show of reason that writers of treatises are often not agreed. It is not to be wondered at under the circumstances that a guilty feeling of inconsistency sometimes arises, and, in the words of a learned editor of Professor Greenleaf's work, [Croswell's Greenleaf on Evidence, 15th ed. I, § 497, n. 4.] "Courts manifest a consciousness of the want of principle upon which the rule excluding such testimony rests."

(Footnote omitted.) 6 J. Wigmore, Evidence, § 1690, at 3-4 (3d ed., 1940).

which it covers. He does say that the code was 10 years old at the time of the trial of this case; however, the date of its relevance was the date of manufacture, or at the latest, the date the ladder was placed in the stream of commerce, and that date was prior to December 30, 1962, when the plaintiff purchased the ladder. Thus the code, which was published October 4, 1956, was little more than 6 years old at the time. For aught that is shown by the record, it is still the accepted code, and there is nothing in the evidence to indicate that the code is outmoded (unless the testimony by the plaintiff's expert, that to his "designer's eye" the two front legs of the ladder in question looked inadequate, could be thus characterized).

Conceding therefore that the code is an expression of opinions of a group of experts, those opinions are relevant on the question of whether the defendant manufacturer properly designed and manufactured the article in question; and if they were not the latest and best opinions on the subject, that fact could have been brought out by the plaintiff, either on cross-examination of the witnesses who testified about the code, or by introducing his own evidence on the matter.

Nor do we think that the fact that the code has not been enacted into law renders it valueless. It is true that were it contained in an applicable statute, compliance with it would at least create a presumption of due care,[4] but the fact that it has not been given the force of law does not mean that evidence that the defendant manufacturer complied with it carries no weight at all. The trial court properly instructed the jury that it should determine the weight to be given to the testimony concerning compliance with the standards set forth in this code.

It should be noted that our cases are not in complete accord on the question of the admissibility of evidence of

---

[4]The National Electrical Code was held to have been adopted by the legislature as an approved standard of construction under RCW 19.28.010 and 19.28.060, in *Folden v. Robinson,* 58 Wn.2d 760, 364 P.2d 924 (1961). We held that it thereby created a rule of evidence according to which proof of compliance with the code presumptively established conformity with one of the most approved methods of construction.

safety standards of this type. In 75 A.L.R.2d 783, the annotator places this court among the minority in approving the admitting in evidence of standards designed to have the force of law, but not applicable in the particular legal circumstances, a minority position of which the annotator approves. The case cited is *Hanson v. Columbia & P. S. R.R.,* 75 Wash. 342, 134 Pac. 1058 (1913). Recovery was sought in that action for the death of a switchman resulting from a failure to provide reasonably safe equipment on a railroad car. This court held that the trial judge did not err in admitting in evidence a plate illustrating the distribution of handholds, grabirons, ladders, and stirrups upon cars according to the standards prescribed by the Interstate Commerce Commission, although the action was not brought under the Federal Liability Act, since the plate was admitted only to illustrate testimony of witnesses as to what were the usual and reasonably adequate safety appliances.

However, in the case of *Hartman v. Port of Seattle,* 63 Wn.2d 879, 389 P.2d 669 (1964), we cited the general rule that evidence of codes or standards of safety issued by governmental bodies as advisory material, but not having the force of law, is not admissible on the issue of negligence. No note was taken of the fact that this rule has been severely criticized. This court did observe, however, that evidence concerning the standards in question (contained in the Electrical Workers' Safety Code) was introduced through testimony of witnesses and held that the exclusion of the code was not prejudicial error. That case, therefore, does not embody a direct holding that codes of this type are inadmissible and in particular it does not deny their relevance.

However, in the recent case of *Valley Land Office, Inc. v. O'Grady,* 72 Wn.2d 247, 432 P.2d 850 (1967), this court stated that it had held in the *Hartman* case that evidence of governmental codes or standards of safety, issued as advisory material not having force of law, is not admissible on the issue of negligence. The merits of the question were not discussed in that case.

In the case of *Grant v. Libby, McNeill & Libby*, 160 Wash. 138, 295 Pac. 139 (1931), this court held that the trial court did not err in excluding a copy of the National Electrical Code, which referred to varieties of electrical installation other than the one with which the case was concerned. This case and *Hanson v. Columbia & P. S. R.R., supra,* were cited by the court in *Hartman v. Port of Seattle, supra,* not as authority for the general rule, but as being worthy of comparison. In the *Hanson* case, of course, the offered evidence was held admissible.

The only authority cited for the rule stated in *Hartman v. Port of Seattle, supra,* was *Mississippi Power & Light Co. v. Whitescarver,* 68 F.2d 928 (5th Cir. 1934). In 1961, the Fifth Circuit Court of Appeals, in admitting a newspaper clipping showing the date of a fire, said that under Rule 43 of the Federal Rules of Civil Procedure the trial judge has discretion to admit relevant and material hearsay if it is necessary and trustworthy. *Dallas Cy. v. Commercial Union Assurance Co.,* 286 F.2d 388 (5th Cir. 1961).

It is questionable, therefore, whether the court which decided the case relied upon for the proposition stated in *Hartman v. Port of Seattle, supra,* would endorse that proposition today.

In another of our early cases, *Schotis v. North Coast Stevedoring Co.,* 163 Wash. 305, 1 P.2d 221 (1931), it was held that regulations of the United States Department of Commerce applicable to American vessels were inadmissible with reference to a foreign vessel. Again, as in *Grant v. Libby, McNeill & Libby, supra,* the proffered evidence failed to pass the test of relevancy.

This court has, of course, followed the majority in holding admissible mortality tables, offered for the purpose of showing life expectancy. *Bradshaw v. Seattle,* 43 Wn.2d 766, 264 P.2d 265 (1953). Also in *Cherry Point Fish. Co. v. Nelson,* 25 Wash. 558, 66 Pac. 55 (1901), United States tide tables, prepared by the government for the use of navigators on the waters of Puget Sound, were held admissible in evidence to determine the depth of the location of a

pound net below low tide in those waters in a suit to restrain its maintenance.

On the subject of mortality tables, Professor Wigmore points out[5] that these tables have been held admissible out of practical necessity, although the rule excluding learned treatises, if consistently applied, would exclude these also. Furthermore, as he points out, they are based upon mere probabilities and working averages, and do not have the dignity of other collections of data which are more conscientiously and expertly compiled but which are excluded as unreliable. The error is not in admitting mortality tables but in misconstruing the true qualities of other scientific publications.

The case of *Sage v. Northern Pac. Ry.*, 62 Wn.2d 6, 380 P.2d 856 (1963), was not cited by the court in *Hartman v. Port of Seattle, supra*. In that case we held, without discussion of the question, that the trial court did not err in admitting in evidence a booklet issued by the National Safety Council, which concerned safety standards for the carriage of loose equipment in vehicles such as a carryall, and that such evidence would be admissible on a new trial.

And in *Vogel v. Alaska S.S. Co.*, 69 Wn.2d 497, 502, 419 P.2d 141 (1966), we held that a federal regulation defining standards of seaworthiness of a ship was admissible in evidence on the issue of negligence of a shipowner, sued by a nonemployee, even though by its terms the act did not govern the liability of the shipowner in an action by a nonemployee. Quoting from *Provenza v. American Export Lines, Inc.*, 324 F.2d 660 (4th Cir. 1963) *cert. denied* 376 U. S. 952, 11 L. Ed. 2d 971, 84 Sup. Ct. 970 (1964), we said:

> The owner's duty does not stem from the regulation, but the regulation may be shown just like other evidence to indicate that a certain practice is safe or unsafe. While such evidence is not conclusive, it is relevant.

While we stated there that the rule was applicable because of the unique doctrine of a claim of unseaworthiness, and the holding was not to be regarded as conflicting with

[5]6 J. Wigmore, Evidence § 1698, at 15 (3d ed., 1940).

*Hartman v. Port of Seattle, supra,* we are now of the opinion that this rule of admissibility should be extended to include safety codes issued by private bodies, which have the relevance and trustworthiness of the code which was offered in this action. The preliminary decision of whether a particular document meets the test of relevancy, trustworthiness, and necessity is for the trial judge. The weight to be attached to it is for the trier of the facts.

As we have indicated, this rule is not out of harmony with our previous decisions, with the exception of *Valley Land Office, Inc. v. O'Grady, supra.* The language in *Hartman v. Port of Seattle, supra,* which suggests that we follow what has been the majority rule in this jurisdiction, is at best dictum. Furthermore, in that case the question of trustworthiness was not discussed, nor were the merits of the particular publication, insofar as its relevance and authoritativeness were concerned. The holding of the case was that, since evidence of the standards was presented to the jury, the plaintiff was not prejudiced by the exclusion of the publication. Insofar as they stand for the proposition that evidence of governmental standards or standards published by private bodies, which do not have the force of law but which are relevant, trustworthy and necessary to prove the matter contained therein, is inadmissible, *Valley Land Office, Inc. v. O'Grady, supra,* and *Hartman v. Port of Seattle, supra,* are hereby overruled.

The second assignment of error pertains to the admission of testimony concerning tests performed by the defendants' expert witness. This witness had tested a ladder of the same kind as that purchased by the plaintiff, under various weights, in various positions to determine the conditions under which it would fall. Although the witness placed the ladder in a number of different positions during the experiments, he was not certain that the exact position of the ladder at the time of the fall had been simulated. The plaintiff's expert witness also performed tests in his laboratory for the same purpose of determining the strength of the ladder and did not attempt to simulate the conditions

existing at the time of the accident. Evidence of these tests was introduced prior to the introduction of evidence by the defendants. Nevertheless, the plaintiff contends it was error to admit the evidence of the defendants' tests.

■ It was not the purpose of the tests to show how the accident happened, but to show how it could have happened. This was also the purpose of the tests performed by the plaintiff's expert. Such evidence is competent and relevant. Any dissimilarity between the conditions under which a test of this kind is performed and those existing at the time of the accident goes to the weight of the evidence and is a matter to be evaluated by the jury. *Bichl v. Poinier,* 71 Wn.2d 492, 429 P.2d 228 (1967). Furthermore, any objection to this type of evidence which the plaintiff might have had was waived when he introduced evidence of his own tests.

■ The final contention of the plaintiff is that the trial court erred in permitting the defendants' expert to testify concerning the properties of metal ladders, and concerning tests he had made. The objection is that the witness was not qualified. The qualifications of an expert are to be judged by the trial court, and its determination will not be set aside in the absence of a showing of an abuse of discretion. *Mason v. Bon Marche Corp.,* 64 Wn.2d 177, 390 P.2d 997 (1964). The evidence showed that the witness had taken his doctor's degree in physical chemistry and metallurgy; that he had worked with the Canadian Mines Branch and for a number of years with a large industry in reduction and research; that he had taught metallurgical engineering at the University of Washington, and then had become a consultant in the general field of materials and their application and their service behavior. The trial court did not abuse its discretion in permitting him to testify. As the trial court observed, the weight of the witness's testimony was for the jury to determine.

The judgment is affirmed.

HILL, FINLEY, WEAVER, HAMILTON, and McGOVERN, JJ., concur.

HALE, J. (dissenting)—All Philip J. Nordstrom wanted to do was buy a stepladder. He bought one at the Fuller Paint Store, 720 North Fairview in Seattle, for $17.32, thinking he knew what he was about. Little did he know, for the ladder gave no premonitory signs, that one day, in a court of law, its buyer would be required to meet and match the combined cerebral output of representatives from Associated General Contractors of America, Association of Casualty and Surety Companies, Association of American Railroads, American Ladder Institute, American Petroleum Institute, National Association of Mutual Casualty Companies, American Federation of Labor, Congress of Industrial Organizations, the Army, United States Department of Agriculture, Bell Telephone, American Telephone and Telegraph Company, National Lumber Manufacturers Association, Metal Ladder Manufacturers Association, United States Department of Labor, Bureau of Labor Standards, and other organizations, including mechanical engineers, safety engineers and fire fighters.

Plaintiff brings this action on the theory that, when he bought the stepladder, he thought it would be reasonably safe to stand on. He now complains that, one time when he was standing on it, it buckled and threw him onto a cement floor. Defendants Fuller Paint, which sold him the ladder, and White Metal Rolling and Stamping Corporation, which manufactured it, say, *inter alia,* that the ladder was all right because it met the standards promulgated, approved and published by the aforementioned delegates at their conclave in New York City October 4, 1956. These American Standards Association standards apparently were promulgated in a document which appears to have been sponsored by the American Ladder Institute, American Society of Safety Engineers and the National Association of Mutual Casualty Companies. I am sure that Mr. Nordstrom has not ceased to wonder how a household stepladder could bear the weight of so heavy a sponsorship and support a householder, too.

The document, considered in evidence as defendants' exhibit No. 17, was entitled the "American Standard Safety

Code for Portable Metal Ladders," and had been published by a private organization which calls itself the American Standards Association, Incorporated. Received in evidence over what I consider sound objections that it was hearsay, not the best evidence and constituted opinion evidence by means of a written document beyond the reach of cross-examination, I would add that it was palpably self-serving, too.

The ASA standards (exhibit No. 17) were offered through the testimony of Mr. Records, a professional mechanical engineer who served as plant manager and chief engineer for defendant White Metal Rolling and Stamping Corporation at Warsaw, Indiana. He testified that his company accepted these standards and produced its ladders to meet them. He had not participated in making the standards, in adopting them, or in the conclaves which led to their adoption. Other than understanding its contents and accepting the standards as sound, the witness had no greater testimonial knowledge of what transpired at the New York meetings than did the court or jury. His company, he said, subscribed to and accepted the ASA standards and then built its ladders better than the minimum requirements set forth therein. All ladders produced by his company, he said, exceeded the ASA standards and would have a greater load carrying capacity and stability than ladders designed strictly according to it. He conceded the code did not have the force of law and admitted that it was, as he expresed it, no more than "A suggestive code for a basic standard for ladders," binding on no one and prepared merely for the benefit of those engaged in the business of manufacturing ladders.

In my opinion, the ASA code amounted to little more than an endorsement of the ladder manufacturing industry, ladder merchants and representatives from selected groups presuming to speak for users of the product. Although providing useful information, this kind of sponsorship in commerce did not, in my judgment, impart such a degree of reliability to the ASA safety standards code as to warrant its admission over objection. As evidence, it was and

is palpable hearsay, and I see nothing in the majority opinion to remove it from that category.

The ASA code itself contains all of the insufficiencies and indicia of unreliability which should exclude it as hearsay. It says, "The code under the above title was first approved on July 25, 1923. Revisions were approved on April 11, 1935, April 2, 1948, and November 10, 1952," and shows that the edition in evidence was promulgated October 4, 1956. It occurs to me that something so intrinsically reliable as to be admitted in a court on the basis that its contents express a quasi eternal verity should not have been subject to such frequent amendment.

I think it good that improvements in ladder technology are reflected in the literature on the subject, but this fails to provide, in my opinion, a basis for assuming that the literature is not hearsay. There is nothing so intrinsically trustworthy about the American Standards Code as to warrant an abrogation of the long-standing rule against hearsay evidence in general. Thus, I am in disagreement with the majority that the ASA code is compatible with Wigmore's recommendation that private safety codes may be admissible on the basis of necessity. 5 Wigmore, Evidence § 1420 (3d ed. 1940). Here the declarant was not a person but purportedly a committee or panel of interested persons meeting to adopt a code of standards at a time nearly 10 years before trial, and in a quest for trustworthy evidence there was no greater necessity to admit the code than to exclude it.

If a ladder manufacturer or merchant wishes to call expert witnesses, he may do so, subject, of course, to the universal principle that they may be cross-examined. Here there was no declarant but rather a committee speaking through a formalized document and leaving the declarants unidentified and unresponsible for its contents. Added to this unreliability, we have the further deficiency of hearsay compounded, for the witness under whose testimony the document was offered in evidence was not present at the conclave which promulgated it.

Subject to certain exceptions, hearsay is universally excluded as being incompetent evidence upon which to establish a fact (29 Am. Jur. 2d *Evidence* § 493 (1967)), and in those instances where an exception prevails and the hearsay is admitted, the hearsay must rest on circumstances establishing a guaranty of trustworthiness of such force as to supply the legal equivalent of the declarant's oath. 29 Am. Jur. 2d *Evidence* § 496 (1967). Thus, a document and its contents may be admissible in evidence where, from its age, nature or inherent quality, and because of the declarant's long-established independence from the offeror its verity should not be doubted, and it could not otherwise be deemed self-serving. Under this principle, such things as mortality tables, government prepared tide tables, newspaper stock market reports and journals reflecting the prices of commodities as of a given date, if of general circulation, are admissible. *Meyer Bros. Drug Co. v. Callison,* 120 Wash. 378, 207 Pac. 683 (1922). But these are things in daily use and acceptance by organized society at large, and if they are untrustworthy that fact would in the ordinary course of continued usage probably emerge. However, this is not the case with a stepladder code of standards.

Even the rule that hearsay evidence may be received to establish pedigree or family relationship is hedged with the safeguard that the declarant must not be available, his statements must have been made prior to trial, and there was no motive or purpose to deceive. McCormick, *Evidence* § 297 (1954). And, in case of paternity dispute, the deceased parents' statements as to paternity are admissible only if made at a time when there was no motive to deceive and clearly not in anticipation of litigation. *Carfa v. Albright,* 39 Wn.2d 697, 237 P.2d 795, 31 A.L.R.2d 983 (1951). The ASA standards meet none of the requirements which would warrant admission as an exception to the rule against hearsay.

Some scholars reject the broad abrogation of the rules against hearsay evidence. Professor Meisenholder, for example, says that Washington law authorizes the *cross-*

*examination* of experts from treatises and textbooks but insists that a foundation must first be laid showing that the witness either admits or in some other way shows that the book or treatise is authoritative. The use of textbooks "on direct is not authorized because the hearsay nature of the text is . . . apparent." Meisenholder, 5 Wash. Prac. Evidence § 358 (1965). Significantly, nowhere in Professor Meisenholder's discussion of the hearsay rule or exception thereto, is it stated that safety codes not having the force of law may or ought to be admitted on direct examination. See Meisenholder, 5 Wash. Prac. Evidence, chs. 20 and 30, 374, 499 (1965).

Finally, I do not read *Hartman v. Port of Seattle,* 63 Wn.2d 879, 389 P.2d 669 (1964), in the same way as does the majority. That opinion, I think, on the question of the admissibility of safety codes was neither dicta, archaic nor lacking in a strong rationale. In passing directly on the admissibility of electrical workers' safety rules not having the force of law but promulgated by the Department of Labor and Industries of this state, this court declared what it considered to be the majority rule, stating, at 886:

> We believe the ruling of the trial court was correct. The general rule is stated by the author in 75 A.L.R. (2d) 778 at 780:
>
> "The majority rule is that evidence of codes or standards of safety issued by governmental bodies as advisory material, but not having the force of law, is not admissible on the issue of negligence, . . ."
>
> So-called standards which do not have the force of law are nothing more than the unsworn opinions of their authors and the authors are not subject to cross-examination. Even the opinions of the authors may change after their rules are written. *Mississippi Power & Light Co. v. Whitescarver,* 68 F. (2d) 928 (5th Cir. 1934). Cf. *Grant v. Libby, McNeill & Libby,* 160 Wash. 138, 295 Pac. 139 (1931); *Hanson v. Columbia & Puget Sound R. Co.,* 75 Wash. 342, 134 Pac. 1058 (1913).

The holding in *Vogel v. Alaska S.S. Co.,* 69 Wn.2d 497, 419 P.2d 141 (1966), based as it was on *Provenza v. American Export Lines, Inc.,* 324 F.2d 660 (4th Cir. 1963), *cert.*

*denied,* 376 U.S. 952, 11 L. Ed. 2d 971, 84 Sup. Ct. 970 (1964), in which excerpts from the "Safety and Health Regulations for Longshoring" promulgated by the Secretary of Labor pursuant to 33 U.S.C. 941, *et seq.,* were admited in evidence, in my view constitutes authority for rejecting the ASA code before us. That case, in my view, supports the proposition that, although safety standards and codes having the effect of law or promulgated by a governmental agency having jurisdiction in the industry, business or calling under regulation are admissible in evidence, such codes or standards are not admissible if emanating from a nongovernmental source.

The reasons supporting the admission of governmental codes and standards and rejecting private ones is that the intrinsic qualities of trustworthiness mentioned by the majority may be said to inhere in the former and are wanting in the latter. But parenthetically, it should be noted that in some jurisdictions even governmental codes are not admissible. 29 Am. Jur. 2d *Evidence* § 891 (1967). *See* Annot., 75 A.L.R.2d 778 (1961).

I would, therefore, reverse on the grounds that the ASA code was erroneously considered in evidence and that, as evidence, it was of sufficient importance and weight to and probably did affect the result of the trial.

HUNTER, C. J., and NEILL, J., concur with HALE, J.