[No. 30720.   Department Two.   August 18, 1949.]

BONNIE LUCAS *et al.*, *Respondents*, v. WILLIAM T. PHILLIPS, *Defendant*, YAKIMA COUNTY, *Appellant*.[1]

[1]Reported in 209 P. (2d) 279.

*Owen Clarke* and *Ronald R. Hull*, for appellant.

*Gavin & Robinson*, for respondents.

ROBINSON, J.—In 1913, a bridge, running across the Yakima river·between Toppenish and Zillah, was reconstructed as part of the highway system of Yakima county. The bridge deck was sixteen feet wide, and, on May 1, 1947, was surfaced with asphalt and equipped with a yellow line running down its center and connecting with a similar line of the road at either end. At both ends of the bridge were signs stating the load limit of the bridge and the maximum speed permitted thereon. The exact location of these signs was not established with certainty, but the testimony most favorable to the defendant Yakima county indicated that they were thirty or forty feet away from the entrances to the bridge. In any event, they were no farther away than that, and there was evidence tending to show that they were a great deal closer. There was no sign warning of the narrowness of the bridge.

Sometime between seven-thirty and eight o'clock on the evening of May 1, one William T. Phillips, traveling toward Toppenish from Zillah, approached the bridge. He was driving a ton and a half flat-bed truck, eight feet wide at the widest place, this being the maximum permissible width for ordinary vehicles using the public highways of this state. Rem. Rev. Stat., Vol. 7A, § 6360-47 [P.P.C. § 292-1]. It was dusk, and his lights were turned on. He had gone most of the way across the bridge, when he noticed an automobile approaching him on the road coming from Toppenish.

Phillips testified that he supposed that the other automobile would stop before reaching the bridge, because, as he put it in his deposition, "Everyone else does. They don't try to meet a car on that bridge because it is so narrow." When he saw that the automobile was coming ahead, he pulled his truck as far as possible to his side of the bridge, and came to a stop, either complete or nearly so, in order that it might have room to pass. The rear wheels of his truck were on his side of the yellow line, but the truck was stopped at somewhat of an angle, and there is testimony suggesting that the rear end of the bed of the truck extended over into the other lane of traffic.

The road approaching the bridge from the Toppenish side is straight and level for one-half or three-quarters of a mile. The car which Phillips saw approaching was being driven by Keneth L. James, and was a 1946 Pontiac coupe, six feet three and three-quarters inches in width. James testified that he had never been over the road before. Accompanying him were a friend, John Clancey, and Mrs. Bonnie Lucas, whom Clancey had planned to take to a show in Yakima that evening. All three were in the front seat, with Mrs. Lucas in the middle. According to the testimony of Phillips, James' car was traveling at a rate of sixty or sixty-five miles per hour, and a farmer who saw the car pass about a quarter of a mile from the bridge, testified that it was going around sixty. James, however, testified that his speed was about forty on the straightaway, and that he reduced it to around thirty-five when he reached the bridge; and the testimony of Mrs. Lucas and Clancey was substantially in agreement with this.

Clancey had admittedly been drinking beer, and possibly also whisky. Several impartial witnesses, who saw James and Mrs. Lucas subsequently, testified that, in their opinion, both of them had been drinking also; but James and Mrs. Lucas denied this, and their denial was supported by Clancey.

As James approached the bridge, he saw the lights of the truck ahead of him. He testified that these were turned on

bright and that they blinded him, but that, supposing that the driver would dim them, he continued on toward the bridge. Then, according to his testimony, the following occurred:

"A. Well, I came on the road, as far as I could figure, and I was coming up on the bridge and I slowed down a little and not too much because I didn't know how wide the bridge was and I figured that there was enough room for me to get by and he kept on coming and he pulled over a little bit more and I seen the railing of the bridge and I couldn't pull over very much more and I got by the front of him and the back of his truck was angling over and it all happened in a split second after that, the last that I can remember was the right hand—the right hand side of my car, the rear of it hitting the bridge at the same time about that I hit his car—his truck."

Two state patrolmen, however, testified that tire marks left on the bridge deck and scars and damage to the bridge itself, and to the truck, demonstrated that the James car approached the bridge straddling the yellow line; that it veered to the right some distance in front of the truck, struck the guardrail, and veered over and struck the left front portion of the rack of the truck; skidded along the side of the truck, and traveled 108 feet to strike the bridge on the left side. The front end broke through the bridge railing, leaving one wheel hanging out over the edge of the bridge. Both bridge and car were severely damaged, suggesting to the state patrol officers, who later arrived at the accident, that the car had struck the bridge with very considerable force. Clancey immediately got out of the car, threw several bottles over the bridge rail, and decamped from the scene. Mrs. Lucas, who was very seriously injured, and James, who was less seriously injured and dazed, were aided by other motorists who arrived shortly after the accident.

James and Mrs. Lucas subsequently brought this action against both Phillips and Yakima county. The cause was tried to a jury, and verdicts in favor of both plaintiffs were returned against Yakima county, dismissing Phillips, and

denying the cross-complaints which had been instituted by both defendants. The jury awarded damages to Mrs. Lucas in the sum of ten thousand dollars, and to James in the sum of seven hundred fifty dollars. From these verdicts, Yakima county has appealed.

■ The principal question presented on this appeal is whether Yakima county's maintenance of the narrow bridge without warning signs constituted such a breach of duty to the traveling public as to amount to negligence on the part of the county. We said, in *Tyler v. Pierce County*, 188 Wash. 229, 232, 62 P. (2d) 32:

"With respect to the second and third charges of negligence, this court has considered the obligation of municipalities to maintain barriers and post signs under varying circumstances. An analysis of the decisions will show that there is no such duty, unless (a) prescribed by law (*Lyle v. Fiorito*, 187 Wash. 537, 60 P. (2d) 709), or (b) the situation is inherently dangerous or of such a character as to mislead a traveler exercising reasonable care (*Neel v. King County*, 53 Wash. 490, 102 Pac. 396)."

There is no statute which would require the county to place warning signs before a narrow bridge. The question, therefore, is whether the facts in the instant case fall within the latter exception to the rule above expressed.

In line with the rule, the cases which have refused to hold counties or other municipalities liable for failure to place warning signs, barriers, and so on, have generally done so on the ground that the hazard involved was one which the ordinary, prudent driver, in the exercise of reasonable care, should have anticipated as a probability, even without the presence of a warning sign. Each time the question arises, it necessarily involves an analysis by the court of the facts of each particular case. Thus, in *Wessels v. Stevens County*, 110 Wash. 196, 198, 188 Pac. 490, liability of the county for failure to place a warning sign before a sharp curve was denied, and the court said:

"Whether the county was negligent in not maintaining a warning sign or barrier depends upon whether the road at the curve presented an extraordinary condition or unusual

hazard. There are probably hundreds of just such curves upon the highways of this state, and if it were held that the county failed in the performance of its duty by not having a warning sign or barrier here, the same would be true of every other similar situation."

In the instant case, the width of the bridge deck was asserted to be sixteen feet, but there was testimony from one of the state patrol officers that its travelable surface was reduced approximately six inches by reason of the guardrail on either side. In either event, it is apparent that two vehicles of the maximum, legal width of eight feet could not pass thereon. Further, although there was a great deal of testimony to the effect that, previously, many automobiles had met and passed other automobiles, and trucks as well, on the bridge without mishap, we have defendant Phillips' own statement that it was customary for drivers of cars to stop before entering the bridge when they observed another vehicle on the bridge approaching from the opposite direction, at least, as he put it, "if they think anything of their cars." Now, it is true that the half or three-quarter-mile straightaway preceding the bridge on the Toppenish side, would give the ordinary driver, in the daytime, ample opportunity to observe that the bridge was excessively narrow, and to act accordingly; and, of course, the same would be true at night, if the driver were familiar with the road. But, obviously, this is not the situation where, as the evidence suggested was the case here, the driver involved was a stranger approaching the bridge at night or at dusk. In the darkness, the long, straight stretch of road running up to the unexpected bridge would actually increase the hazard. And there was nothing whatever about the condition of the premises to warn James that it would be the better part of caution to stop his vehicle in order to allow another to pass, with maximum safety, over the bridge.

We find no negligence on the part of the county arising solely from the maintenance of this narrow bridge; to do so would place an imponderable burden upon the various counties throughout the state which maintain many bridges of this type. See *Leber v. King County*, 69 Wash.

134, 124 Pac. 397, 42 L. R. A. (N.S.) 267. But this consideration is not a factor where the breach of duty alleged is merely the failure to place proper warning signs at the entrances to such bridges.

This bridge was an integral part of the highway along which it was erected. *Berglund v. Spokane County*, 4 Wn. (2d) 309, 103 P. (2d) 355. The county, having built, maintained, and operated it, was bound to use such care as would keep it in a reasonably safe condition for those who might go upon it; and. this duty included the placing of proper warning signs where necessary. See, *Gray v. King County*, 140 Wash. 169, 248 Pac. 397. Under the circumstances, it is our opinion that the jury was warranted in finding that this narrow bridge, in the position in which it was located, was inherently dangerous and would tend to mislead a driver traveling at night, or at dusk, and exercising reasonable care; that, common though such bridges may be in parts of Yakima county, and in rural areas elsewhere in the state, to stranger drivers, such as James, this one constituted an unusual hazard; and that the county was, therefore, negligent in not maintaining signs to warn travelers of its lack of width.

But the county contends that the maintenance of this bridge without adequate warning signs cannot be considered the proximate cause of the accident; that, on the contrary, the evidence indicates that the intervening and concurring acts of the driver of the truck, Phillips, and of the plaintiff James, in the operation of their vehicles, were the proximate cause thereof, and that the nature of construction of the county's bridge was only a setting for what took place.

It seems to us, however, that whether James' version, or the county's version, of the episode be accepted as correct, the unexpected narrowness of the bridge was an effective cause of the accident without which it would not have occurred. The actions of Phillips and James, even though negligent, would not be superseding causes with respect to the county's negligence, if the county, under the

circumstances, should have realized that drivers on the bridge might act as they did. The jury could well have found that this was precisely the type of accident which the county ·could, and should, have foreseen would be likely to happen as the result of its failure to place proper warning signs. If it did so find, under the circumstances of this case, the county would be liable. *Berglund v. Spokane County, supra.*

■ The county further contends that James should be held contributorily negligent, and that, in consequence, he, at least, must be barred from recovery. However much there may be in the record to support this contention, and there is admittedly a great deal, it rests largely upon disputed evidence. The question of James' speed at the time of the accident, his degree of sobriety, whether or not he was driving on the wrong side of the road, how dark it was, and the effect of all of these things in contributing to the accident, were all questions of fact properly to be resolved by the jury.

■ It is true that James entered the bridge, according to his own testimony, at a speed in excess of the twenty-five miles per hour specified by the warning sign at the end of the bridge. As the court instructed the jury, however, the state law provides that such speed restrictions, to become effective, must be posted at either end of the bridge, at a distance of *not less* than one hundred feet from either end of such bridge. Rem. Rev. Stat., Vol. 7A, § 6360-70 [P.P.C. § 296-13]. It appears that, in the instant case, the speed limit signs were erected at a distance less than one hundred feet from either end of the bridge, and, therefore, cannot, of themselves, be considered as the speed limit controlling the James vehicle. Therefore, we are not of the opinion that the evidence in this case requires that James be held contributorily negligent as a matter of law. The question of whether he should be held contributorily negligent as a matter of fact was submitted to the jury under proper instructions.

The final question to be considered is the propriety of the amount of damages recovered by the respondent Bonnie Lucas. Mrs. Lucas suffered a fracture of the pelvis on the right-hand side, and a severe facial laceration. Although the treatment of the fracture was quite painful, it has now healed, and the only permanent result, according to the testimony of her doctor, will be a certain amount of stiffness and pain, if she does any more than the usual walking. On the other hand, the facial laceration has left a permanent disfiguring scar across her face, and also has resulted in the condition described in the following testimony of her doctor:

"Q. Was there any damage to the nerves? A. Yes, I think probably since the jury can watch me here I can show that this lady has twitching in the lower eyelid and the vessel was injured in this facial area here and in the process of the injury one of the nerves was injured here and also the nerve beneath the eye, the infraorbital nerve was damaged. . . . This young woman is going to always have a certain amount of twitching from that lower eyelid and tearing from that eye, particularly in the early morning from the wind and cold because the tear glands and tear ducts have been destroyed and the actual mechanism of clearing the eye of tears has been destroyed."

Mrs. Lucas claimed special damages in the sum of $442.75 for hospital bills, and of $150 for doctor bills.

The jury's verdict awarding Mrs. Lucas ten thousand dollars is challenged as being so excessive as to indicate that it was the result of passion and prejudice. We do not agree with this contention; and, though, on the basis of the evidence presented in the record, the award seems high, we must take into consideration the fact that we do not have the plaintiff before us, as did the jury and trial judge, and are, therefore, not in a position to make as accurate an estimate of the extent of her injuries, and of the damages to which she is consequently entitled, as were they. For this reason, we decline to disturb the amount of the award.

by the court.

The judgment is affirmed.

JEFFERS, SCHWELLENBACH, and GRADY, JJ., concur.

SIMPSON, C. J., concurs in the result.

