[No. 31161. Department One. November 14, 1949.]

E. H. THOMPSON, *Respondent,* v. THE CITY OF SEATTLE, *Appellant.*[1]

[1]Reported in 211 P. (2d) 500.

*A. C. Van Soelen* and *Arthur Schramm,* for appellant.
*Jones & Bronson* and *Story Birdseye,* for respondent.

SIMPSON, C. J.—This is an appeal from a verdict and judgment of the superior court in a personal injury action where liability was admitted, and this case was submitted to the jury solely for determining the amount of damages.

On appeal to this court, the appellant city makes and argues the following assignments of error: (1) the verdict was excessive; and, (2) the court erred in giving instruction No. 4.

September 22, 1947, respondent boarded a Seattle bus, intending to go home for dinner from his downtown place of business. The bus stopped at a point close to respondent's home, and he attempted to leave by the side door. As he did so, the door was shut on his back and he was hurled onto the street. As a result of the fall, respondent's leg was broken. Although respondent did not lose consciousness, he could not get up from the street. The bus driver and another man picked him up and placed him on a platform under a commercial signboard. Within a short time thereafter, an official of the company arrived with a car and took respondent to the Seattle General Hospital. Upon arrival at the hospital, respondent was immediately placed in bed, but the doctor was unable to do anything to repair the damaged leg for at least three days because of the shock attendant upon the accident, and the fact that the patient contracted a cold which congested his lungs somewhat.

After respondent recovered from the state of shock, the doctor performed an operation, making a seven-inch incision near the break, which was close to the hip. He was then taken from the operating room, where he was placed on a board which rested on the mattress of the bed. He was placed with his feet in an elevated position. Although his leg was not put in a cast, the doctors and attendants, in arranging his bed, placed sandbags along and between respondent's legs to keep him from moving. He lay in this position for about sixty days. During that time, he was turned every half hour, then later, every hour, and finally from two to three hours, from one position to another. Each time his position was changed, it caused him severe pain. Because of the fact that he was in a trussed position, he developed bedsores, which caused him great pain and suffering. During the three-month period he was in the hospital, respondent was allowed to be out of bed only about the last two weeks, at which time he found that he was very weak and that he weighed about forty pounds less than his normal weight.

After arriving at his home, respondent was kept in a wheelchair, when not in bed, for a long period of time. His leg had been placed in a brace, which kept it stiff and made it very hard for him to control his actions. He testified that he suffered intense pain during this period, in that his leg would ache and keep him from sleeping. Also, that he required a great deal of help, in that he could not get up, or dress himself. However, sometime in July of 1948, which was nearly nine months after the accident, he was able to return for short periods of time to his place of business. He had to work by sitting on one stool and placing his leg on another. He and his wife operated a coffee and tea shop in stall three of the Seattle Public Market. There he specialized in the blending of coffees and teas.

At the time of the trial, which was almost two years after the accident, respondent found that he still had to use crutches, or a crutch and a cane, and could barely walk without assistance. The pain in his leg where it had been

broken continued, and running sores had developed on his lower leg. His leg itched and burned and required treatment every morning and every evening. His condition made it impossible for him to carry on his normal activities at home or in the store. In fact, he was unable to bathe himself. The jury saw respondent's foot and that portion of his leg below the knee. The leg was discolored and scarred, and there was a sore on it which still required bandaging.

■ The first error assigned has to do with the amount awarded by the jury, which was in the sum of fourteen thousand dollars. It is, to be sure, a larger amount than has usually been given for injuries such as occurred here. However, times have changed, and the purchasing power of the dollar is much less than it was in days gone by. This we must take into consideration when deciding the question of whether the verdict was excessive. *Kellerher v. Porter,* 29 Wn. (2d) 650, 189 P. (2d) 223.

■ In the case just cited, and *Carlson v. P. F. Collier & Son Corp.,* 190 Wash. 301, 67 P. (2d) 842, we recognize the rule that the determination of the amount of damages is primarily the province of the jury, and that courts will not interfere with such verdicts unless there is a clear indication that the amount was excessive and its determination was occasioned by bias, prejudice, or passion.

■ Another factor to be considered is that:

"There should be no distinction in the weight to be given to the verdict of the jury in the assessment of damages for personal injuries and their findings of fact on any other question. The jury heard all the testimony in the cause and doubtless gave credence, as it was the right and duty of the jury to do under the law, to the testimony of respondent Atkins and others with regard to his injuries; and if that testimony is true, the amount of damages which the jury assessed was not excessive." *Atkins v. Churchill,* 30 Wn. (2d) 859, 194 P. (2d) 364.

■ With these rules in mind, we have carefully considered the evidence which told of respondent's pain and suffering, his inability to rest and do work, and enjoy life;

and the very evident continuation of pain and suffering the respondent will experience through the remaining years of his life. From this study, we hold that the verdict was not excessive.

The last assignment of error has to do with instruction No. 4, which reads:

"The life expectancy of a man of plaintiff's age, as of the date of the trial, is five years."

The objection to this instruction is based upon the fact that there was no medical testimony to the effect that the injury .was permanent.

█ It is undoubtedly the general rule that medical testimony must be given to the effect that an injury is permanent before the court is justified in instructing a jury concerning an individual's life expectancy. *Ely v. North Coast Lines,* 151 Wash. 137, 275 Pac. 78; *Lieske v. Natsuhara,* 165 Wash. 270, 5 P. (2d) 307. The *Ely* case was cited and distinguished in the *Lieske* case, in which this court held that the court's instruction relative to damages the injured party might sustain in the future was proper. The holding was based upon the showing that the injured party was not free from pain at any time after her injury, and at the time of the trial, nine months after she was hurt, she was wearing a bandage as directed by her physician.

The contention of the city is foreclosed by the case of *Fisher v. Anacortes,* 109 Wash. 191, 186 Pac. 271, where it was held:

"The court admitted in evidence a mortuary table showing the expectancy of life of a person of the age of the respondent, and this constitutes the erroneous admission of evidence forming the groundwork for the third assignment. There was no evidence that the respondent's injuries were permanent, other than the inference arising from her testimony to the effect that she had not fully recovered at the time of the trial, some thirteen months after the injury was received. It would seem that, from this circumstance, the respondent had the right to contend that her injuries were of a permanent nature, and, if so, the mortuary table was plainly admissible. But if the rule be otherwise, the admission of the table was harmless. In

itself it had no probative value; that is, it conveys no information that is not the common knowledge of mankind. As evidence, it stands on the plane of a calendar, an almanac or a report of the weather bureau; it is but a convenient reminder of facts which the human mind cannot always bring to remembrance."

Here, as in that case, there was evidence of continued pain and suffering, and a failure of recovery at the time of trial. Under the evidence, as we have set it out in this opinion, we must conclude that the court acted properly when it gave instruction No. 4.

Finding no error, we affirm the judgment.

MALLERY, SCHWELLENBACH, GRADY, and DONWORTH, JJ., concur.

