[No. 32400. Department Two. November 30, 1953.]

GEORGE E. BRADSHAW *et al., Respondents,* v. THE CITY OF SEATTLE *et al., Appellants.*[1]

[1] Reported in 264 P. (2d) 265.

*A. C. Van Soelen* and *Arthur Schramm,* for appellant city of Seattle.

*Dean H. Eastman* and *Roscoe Krier,* for appellant Northern Pacific Railroad Company.

*Kennett, McCutcheon & Soderland* and *Gould & Ackley,* for respondents.

DONWORTH, J.—This case involves four causes of action arising from a collision between an automobile and a Northern Pacific locomotive. The driver of the car, George Bradshaw, and Thomas Matthews, as guardian *ad litem* of Daniel Lynn Fisher, a minor, seek recovery for property damage and personal injuries. Melvin De Vore, as administrator of the estate of his wife, Fae De Vore, seeks recovery for her wrongful death, on behalf of himself and on behalf of her minor son, Daniel Lynn Fisher. Mrs. De Vore and her son were riding in the automobile as guests of Mr. Bradshaw when the collision occurred.

Defendants are the city of Seattle and the Northern Pacific Railroad Company. The jury returned a verdict for the plaintiffs against both defendants. Judgment was entered thereon, and both defendants have appealed.

For the sake of convenience, plaintiffs will be referred to respectively as Mr. Bradshaw, Fae De Vore, and Danny Fisher. Defendants will be referred to as "the city" and "the railroad."

West Marginal way is a nonarterial, two-lane street within the city limits of Seattle. It is somewhat winding, but runs roughly north and south. The paved portion is approximately nineteen feet in width and is bordered on both sides by gravel shoulders. To the west of the street is an occasional manufacturing plant. Paralleling the street on the east is a main track of the railroad. Within a distance of 2.4 miles, beginning at Michigan street and extending north, there are four sets of imbedded rails crossing the paved portion of this street. Prior to the accident (which happened on May 16, 1950), three of these sets of rails had been torn up on each side of the pavement, leaving the exposed ends visible, thus making these crossings obviously unusable.

The accident occurred at a spur crossing near west Adams street. This is the third set of imbedded rails encountered by a driver traveling north from Michigan street. This spur track leaves the main track on the east, curves, and crosses the street diagonally in a southwesterly direction. There was no warning sign or device at this location.

At the time of the accident, Mr. Bradshaw was driving north on west Marginal way, having (as above noted) Danny Fisher and his mother as guests. The visibility was good, although it had just started to rain. Mr. Bradshaw was aware of the four sets of imbedded rails, as he had driven this route frequently on the way to work.

The remaining facts are in dispute. Plaintiffs' evidence, which the jury was entitled to believe, was based upon the testimony of Mr. Bradshaw and two disinterested witnesses. It tended to establish these additional facts:

Mr. Bradshaw was driving just within the twenty-five mile per hour speed limit. He was aware of the existence of

this crossing but had never seen a train use it and, because it looked the same as the other three sets of rails, thought it was unusable. Just south of the crossing on the east side of the pavement, the gravel shoulder was between eight and ten feet wide. Separating the shoulder from the parallel main track was a growth of grass, weeds, brush, and small trees ranging in height from a few inches to several feet. This tended to hide the rails and obstruct the driver's view of any train crossing the street on the spur track after switching from the main track on the east. On the west shoulder the rails were hidden in the gravel, since the crossing was used only at infrequent intervals. One witness who lived nearby said he had only seen it used six or seven times in six years. The crossing, therefore, gave the same appearance to a driver as the three unusable crossings.

Mr. Bradshaw first saw the locomotive as it came through an opening in the brush onto the east shoulder. He was then about forty or fifty feet from the crossing. The locomotive, a diesel switch engine traveling without cars, was not ringing a bell or blowing a whistle. It was traveling backward somewhat less than ten miles an hour. No flagman was present warning drivers of approaching cars at the crossing. Mr. Bradshaw applied his brakes as soon as he saw the locomotive. An expert witness testified that, allowing time for a driver to get his foot on the brake, in his opinion it was impossible to stop a car traveling twenty-five miles an hour within fifty feet under the conditions prevailing at that time.

The evidence showed that, at the time of the impact, both vehicles had almost come to a stop. The right front quarter of Mr. Bradshaw's car struck the rear of the 120-ton locomotive. The collision was severe enough to cause serious injury to Mr. Bradshaw and badly damage his car. Danny Fisher was less seriously injured, but his mother, Fae De Vore, was killed.

Appellants' evidence tended to show that Mr. Bradshaw was exceeding the speed limit, that his view of the crossing was not obstructed, and that adequate warning was given

by a continuous ringing of the bell and the presence of a flagman walking in front of the locomotive as it approached the pavement. (The flagman died prior to the trial, and consequently his testimony was not available.) All five remaining members of the locomotive crew testified that respondents' two disinterested eyewitnesses to the accident were not present at the scene at all.

This conflicting testimony bearing upon the questions of negligence or lack of negligence on the part of the respective parties presented an issue of fact for the jury to decide.

Respondents' complaint alleged that the city was negligent: (1) in allowing brush, trees, and vegetation to grow alongside the street, which obstructed an approaching driver's view of the crossing, thus creating an inherently dangerous situation, and (2) in failing to place and maintain near the spur track traffic signs or other devices to warn motorists. It was further alleged that the railroad was negligent, in addition to being jointly responsible for the lack of such traffic signs, in failing: (a) to have a flagman in plain view a reasonable time before the locomotive entered the highway and to warn of the approach of the locomotive, (b) to keep a proper lookout for travelers, (c) to apply the brakes seasonably, and (d) in proceeding onto the roadway when reasonable care would have indicated that a collision was imminent.

The city makes twelve assignments of error, and the railroad claims seventeen errors. Some of them are identical, but most of them raise questions applicable to only one of the appellants. For reasons hereinafter stated, we do not find it necessary to discuss all twenty-nine assignments but will notice only those which are determinative of these two appeals.

We now consider the city's first assignment of error, which is based on the trial court's denial of the city's motion for judgment notwithstanding the verdict. Two grounds were included in the motion:

"(a) No liability on city as matter of law.

"(b) Plaintiff Bradshaw was guilty of contributory negligence as matter of law."

In support of the first ground, the city argues that a municipality is not liable for negligence of its officers and employees when engaged in the performance of governmental or public duties, but is liable for their negligence only when performing duties in connection with the exercise by the municipality of its corporate or private powers. *Hagerman v. Seattle,* 189 Wash. 694, 66 P. (2d) 1152, 110 A. L. R. 1110, and cases cited; *Hutton v. Martin,* 41 Wn. (2d) 780, 252 P. (2d) 581.

█ We have held that, in the ownership, control, and supervision of its streets, a municipality acts in its governmental and not its proprietary capacity. Thus, the erection of traffic signs is a governmental function. *Phinney v. Seattle,* 34 Wn. (2d) 330, 208 P. (2d) 879.

█ However, a municipality may be held liable for injuries resulting from ministerial acts relating to the improvement and maintenance of public streets. 18 McQuillin on Municipal Corporations (3d ed.) 253, § 53.41. In this state, the maintenance and repair of streets for the purpose of keeping them in a reasonably safe condition for public travel is classified by our decisions as a corporate duty, with respect to which a municipality is liable for negligence. *Hewitt v. Seattle,* 62 Wash. 377, 113 Pac. 1084; *Lund v. Seattle,* 99 Wash. 300, 169 Pac. 820; *Hagerman v. Seattle, supra.*

In the present case, there is no evidence that west Marginal way was not properly maintained or repaired. That no defects or obstructions existed in the street itself, was conclusively shown by Mr. Bradshaw's testimony that he had traveled this street many times in the past and that it carried heavy traffic without difficulty during the rush hours. Since there was no defect in the street itself (it is not contended that the street was dangerous in any manner except at the very infrequent intervals when trains crossed the pavement), the city could not be liable as a matter of law unless (1) it was under a duty to cut the brush, trees, and vegetation growing along the sides of the street (beyond the gravel shoulders) which is alleged to have created an

inherently dangerous situation, or (2) it was under a duty to erect suitable warning signs near the spur track.

█ Where a street itself is reasonably safe for public travel, it is not rendered inherently dangerous solely because a municipality fails to cut down natural vegetation which tends to obstruct the view at an intersection. *Barton v. King County*, 18 Wn. (2d) 573, 139 P. (2d) 1019. In that case, which involved a collision between a bicycle and a motor vehicle at an intersection where each operator's view was obstructed by vegetation, this court said:

"Respondents [plaintiffs] urge, however, that the situation presented here brings this case within an exception to this general rule. This exception has been recognized in cases where it has been contended that a municipality was negligent in failing to maintain warning signs or barriers along a street or highway. *Neel v. King County*, 53 Wash. 490, 102 Pac. 396; *Leber v. King County*, 69 Wash. 134, 124 Pac. 397, 42 L. R. A. (N.S.) 267; *Wessels v. Stevens County*, 110 Wash. 196, 188 Pac. 490; *Tyler v. Pierce County*, 188 Wash. 229, 62 P. (2d) 32; *Johanson v. King County*, 7 Wn. (2d) 111, 109 P. (2d) 307; *Simmons v. Cowlitz County*, 12 Wn. (2d) 84, 120 P. (2d) 479. The gist of the decisions in these cases, in so far as they are pertinent to the question under consideration, is that the municipality *may* be chargeable with negligence for failure to maintain warning signs or barriers *if the situation along the highway is inherently dangerous or of such character as to mislead a traveler exercising reasonable care.*

: "It is respondents' contention that, at their intersection, Normandy Terrace and Brittany Circle Drive were rendered inherently dangerous to travelers exercising reasonable care, by reason of natural vegetation obscuring the view. We think the contention is untenable. To allow it would be to hold, literally, that thousands of county road intersections are inherently dangerous. To so hold would impose an imponderable responsibility upon counties. . . .

"We are of the opinion that the intersection at Normandy Terrace and Brittany Circle Drive was not inherently dangerous or of such a character as to mislead a traveler exercising reasonable care. We hold, therefore, that King county was not negligent 'in failing to remove [the] vegetation' which obscured the vision of the rider of the bicycle and the driver of the truck. While no case involving identical

facts has been called to our attention, we find substantial support for our position in the following authorities: 25 Am. Jur. 784, § 500; *Bohm v. Racette,* 118 Kan. 670, 236 Pac. 811, 42 A. L. R. 571; *Earle v. Inhabitants of Concord,* 260 Mass. 539, 157 N. E. 628, 53 A. L. R. 762; *Jones v. Fort Dodge,* 185 Iowa 600, 171 N. W. 16; *Goodaile v. Board of County Commissioners of Cowley County,* 111 Kan. 542, 207 Pac. 785; *Lambel v. Florence,* 115 Kan. 111, 222 Pac. 64; *Moore v. State Highway Commission,* 150 Kan. 314, 92 P. (2d) 29."

▉ We think the same reasoning applies to cities as well as to counties. It must be borne in mind that the city had no control over the operation of the locomotive involved in this case. There was no inherent danger in the street itself. The city had a right to assume that locomotives operating over this crossing would proceed without negligence and with due regard to the rights of users of the street. The presence of vegetation along the edge of the boundary of the street did not create any liability against the city.

As to the second allegation of negligence against the city, the rule is well established that a municipality is not negligent in failing to erect and maintain warning signs or barriers unless (a) the situation is inherently dangerous, *Neel v. King County,* 53 Wash. 490, 102 Pac. 396, or (b) such signs or barriers are specifically required by statute. *Lyle v. Fiorito,* 187 Wash. 537, 60 P. (2d) 709; *Phinney v. Seattle, supra.*

▉ In the absence of an express statute, a municipality cannot be held liable for failure to erect warning signs or barriers to apprise travelers of extraordinary or unusual conditions unless the danger existed in the highway itself. *Leber v. King County,* 69 Wash. 134, 124 Pac. 397; *Wessels v. Stevens County,* 110 Wash. 196, 188 Pac. 490; *Tyler v. Pierce County,* 188 Wash. 229, 62 P. (2d) 32; *Barton v. King County, supra; Lucas v. Phillips,* 34 Wn. (2d) 591, 209 P. (2d) 279.

Accordingly, since in this case there was no extraordinary or unusually dangerous condition existing in the highway itself, the judgment against the city must be reversed unless

there is a specific statutory duty to erect a stop or warning sign at this location.

Respondents contend that RCW 47.36.060 [cf. Rem. Rev. Stat. (Sup.), Vol. 7A, § 6400-52] imposes such duty. We must, therefore, examine chapter 53, p. 137, Laws of 1937 (from which the section is derived), in which the legislature adopted a comprehensive set of legal rules known as the Washington state highway act.

Section 50 of the act directed the state director of highways to adopt a uniform system of traffic control signals to be used throughout the state.

Section 52 read:

"Local authorities in their respective jurisdictions shall place and maintain such traffic devices *upon public highways under their jurisdiction as they may deem necessary* to carry out the provisions of the law or local traffic ordinances or to regulate, warn, or guide traffic. The governing authorities of incorporated cities and towns shall adequately equip with traffic devices those city streets which are designated as forming a part of the route of a primary state highway through any such incorporated cities and towns." (Italics ours.)

Two years later, the legislature amended § 52 (by chapter 81, p. 214, Laws of 1939) to read in part as follows:

"Section 52. It is hereby declared to be the duty of local authorities in their respective jurisdictions to place and maintain *such traffic devices upon public highways under their jurisdiction as may be necessary* to carry out the provisions of the law or local traffic ordinances or *to regulate, warn or guide traffic.*" (Italics ours.)

It will be noted that the legislature changed the directive to the local authorities to place and maintain traffic devices upon public highways under their jurisdiction *from* such "as *they* may deem necessary" *to* such "as *may be* necessary . . . to regulate, warn or guide traffic."

Respondents rely heavily upon this change of language as imposing a statutory duty on the city to erect warning signs at the crossing involved in this case. In their brief at page 18, they say:

"This legislative history clearly demonstrates the meaning of the present statute. It is no longer the prerogative of the City to determine what signs are necessary. It is now a factual question. If a sign is in fact necessary to warn traffic (and that is for the jury to determine upon conflicting evidence) then the City is under a statutory duty to maintain a sign and the failure to do so makes the City responsible in damages for the proximate results."

With this interpretation, we cannot agree. In *Phinney v. Seattle, supra,* we held that the legislature had commanded the city to designate certain streets as arterial highways and to install and maintain stop signs at each intersection with the arterial highways. It was held that, since the city had disobeyed the statutory command of·the state, a person who was injured by a vehicle which failed to stop at such intersection because no sign was maintained, might recover damages from the city.

The present case is quite different. Here the legislative command is to install and maintain such traffic devices "as may be necessary to carry out the provisions of the law or local traffic ordinances or to regulate, warn or guide traffic." No specific places in the city are designated either by description or otherwise, nor is there any indication given in the statute *as to who* shall determine what traffic devices are necessary at any given point to regulate, warn, or guide traffic. Obviously, the local authorities are not given the power to determine these matters, because the 1939 amendment replaced the 1937 provision which gave such discretion to the local authorities.

Having taken this discretion away from the local authorities and not having vested it in any other person, officer, board, or municipal body, the command of the legislature is too indefinite to enable any city officials to know when the city is, or when it is not, disobeying the legislative command. Under the circumstances of this case, § 52, as amended, is so indefinite in this respect that it cannot be made the basis for the recovery of damages from the city on the ground that no traffic devices were installed and

maintained on west Marginal way near this railroad crossing.

If the city can be held liable for the accident involved in this case, then the same result would follow in every instance where, in the absence of warning signs, an accident occurs within the city limits. Before it will be held that the legislature intended such a far-reaching change in the doctrine of municipal liability, the legislature must impose a definite duty upon the local authorities in language specific enough so that they can ascertain when they are and when they are not disobeying its command.

■ The governmental immunity which a city enjoys as a state agency can be taken away only by a legislative enactment specific in meaning. *Lacock v. City of Schenectady*, 224 App. Div. 512, 231 N. Y. S. 379, affirmed in 251 N. Y. 575, 168 N. E. 433. A statute removing such immunity, being in derogation of the common law, must be strictly construed. *Johnson v. Board of County Road Commissioners of Ontonagon County*, 253 Mich. 465, 235 N. W. 221; *Reeves v. City of Easley*, 167 S. C. 231, 166 S. E. 120; *Abernathy v. City of Columbia*, 213 S. C. 68, 48 S. E. (2d) 585; 18 McQuillin on Municipal Corporations (3d ed.) 209, § 53.27.

Carrying respondents' argument to its logical conclusion would mean that local authorities would never know when traffic devices were required at a particular location until after a jury had determined that *they* deemed it necessary for the city to install them there. Necessarily, this would be after an accident had occurred and after the jury's verdict against the city. It would then be too late for such information to be of any benefit to the city.

For the above reasons, we hold that the city is not liable for failing to erect a warning sign at this crossing. There being no legal basis for any liability on the part of the city, its motion for judgment notwithstanding the verdict should have been granted on the first ground stated above. We need not consider the second ground of the motion (that Mr. Bradshaw was guilty of contributory negligence as a matter of law).

■ The city's remaining assignments of error deal with instructions (given or refused) and are no longer of any concern. *Watson v. Northern Pac. R. Co.*, 37 Wn. (2d) 374, 223 P. (2d) 1057.

We now turn our attention to the assignments of error raised by the railroad. By its first two assignments, it contends that the trial court erred in denying its motions for a directed verdict and judgment notwithstanding the verdict. It is claimed that, as a matter of law, the evidence established the fact that the crossing was not extrahazardous, that the negligence of Mr. Bradshaw was the sole proximate cause of the injury, and that the situation here presented did not constitute a trap and the alleged deception was not the proximate cause of the injuries.

The railroad calls attention to our decisions in *Sadler v. Northern Pac. R. Co.*, 118 Wash. 121, 203 Pac. 10; *Carroll v. Union Pac. R. Co.*, 20 Wn. (2d) 191, 146 P. (2d) 813; *Hopp v. Northern Pac. R. Co.*, 20 Wn. (2d) 439, 147 P. (2d) 950; *Watson v. Northern Pac. R. Co., supra*; and *Porter v. Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 41 Wn. (2d) 836, 252 P. (2d) 306.

While these cases all resulted from grade-crossing accidents, none of them involved a situation like that presented here. Each case of this type must be considered in light of its own particular facts. *Cox v. Polson Logging Co.*, 18 Wn. (2d) 49, 138 P. (2d) 169, and cases cited.

■■ A crossing is extrahazardous where unusual circumstances or conditions exist which make it so peculiarly dangerous that prudent persons cannot use it with safety unless extraordinary measures are used. *Porter v. Chicago, Milwaukee, St. Paul & Pac. R. Co., supra*. Considering all the circumstances present in this case, including the similarity in appearance between this crossing and the abandoned ones on the same street, the infrequency of its use, the limited view of an approaching train, and the lack of warning precautions, we cannot say as a matter of law that the crossing was not extrahazardous. Whether the precautions taken by the railroad were adequate under the

circumstances, was a question for the jury to decide. *Swanson v. Puget Sound Electric Ry.*, 118 Wash. 4, 202 Pac. 264; 44 Am. Jur. 747, Railroads, § 507. The court's refusal to instruct that no flagman was necessary was correct in light of the evidence from which the jury could have found that the crossing was extrahazardous and that extra precautions were necessary.

 Nor did the court err in refusing to hold as a matter of law that Mr. Bradshaw's negligence was the sole proximate cause of the accident. It is argued that the "physical facts" speak with such force as to overcome all testimony to the contrary. A total of twenty-six photographs were admitted in evidence, which showed various views of this crossing taken at different angles and distances from the rails. The railroad asserts, for example, that they conclusively prove that a driver approaching the crossing from the south could, when 250 feet from the rails, see a locomotive on the spur track 157 feet northeast of the pavement.

The problem is not that simple. There was no evidence that the locomotive was within 157 feet of the pavement at the time Mr. Bradshaw was 250 feet from the crossing. The speed of his car and that of the locomotive, their relative positions just prior to the accident, and the amount of obstruction to the view, were all matters of dispute. The court properly declined to rule as a matter of law that Mr. Bradshaw was contributorily negligent.

 From what has already been said about the conflicting evidence, we think that the question of whether or not a deceptive situation existed which reasonably misled Mr. Bradshaw and was a proximate cause of the accident, was also a jury question.

Error is claimed in the giving of instructions Nos. 10 and 18, dealing with the alleged negligence of the railroad and contributory negligence of Mr. Bradshaw. When read together with other instructions (to which no exceptions were taken), the jury was correctly informed of the applicable law on these issues. The court submitted special interroga-

tories dealing with negligence, contributory negligence, and proximate cause. By their answers, the jurors resolved all of these issues in favor of the respondents. In view of the conflicting evidence, we cannot substitute our judgment for theirs.

The next assignment relates to the denial of a motion for mistrial. The motion was based upon the following incident, which occurred when respondents' counsel questioned Mr. Bradshaw as follows:

"Q. Now, the defense has introduced some exhibits here on which we have a stamp 'State v. Bradshaw' and we have heard some talk about a prior trial. You were found not guilty in that trial, weren't you? A. I was. Mr. Schramm: I object to that—just a minute—that is not a proper question. Mr. Soderland: If the court please, the defense could have had prints made of these, but they elect to show this jury that this man has been charged with negligent homicide for causing this death. I very carefully referred only to a prior hearing."

There are two reasons why this improper reference to Mr. Bradshaw's acquittal in the criminal case and the denial of a mistrial did not constitute reversible error. For one thing, counsel for the railroad was the first to refer to the criminal case in the presence of the jury. Furthermore, the situation would not have arisen if this appellant had removed the notations from the backs of the photographs before they were offered in evidence. An explanation was thus invited, and whatever fault rested upon respondents' counsel for injecting an improper matter into the case rested equally upon opposing counsel. See *Hines v. Foster*, 166 Wash. 165, 6 P. (2d) 597.

Secondly, assuming that any prejudice resulted from the incident, it was not substantial and was cured by the court's prompt action in striking the question and answer from the record and instructing the jury to entirely disregard what may have happened in another trial. *Auerbach v. Webb*, 170 Wash. 567, 17 P. (2d) 1. We find no merit in this assignment.

■ The next assigned error refers to the admission in evidence of a map drawn to scale by a witness which was offered by respondents showing the street, spur track, and other physical features. The error claimed in its admission is based upon the presence of an area on each side of west Marginal way colored green and marked "brush." It is argued that the map gave the jury the erroneous impression of a solid wall of vegetation of uniform height cutting off all view on either side of the highway, when actually the vegetation was composed of grass, weeds, and shrubs of varying heights and density.

We cannot agree that the jury was deceived by the map, because it represented a flat view of the crossing and did not purport to show the height of anything. Furthermore, the twenty-six photographs admitted in evidence did show the height and density of the vegetation at various points near the crossing, and the jury was fully aware of the exact character and location of trees, shrubbery, and grass, and could determine the extent to which they did or did not obstruct the driver's view of the crossing.

Error is also assigned to instruction No. 5, in which the jury was told that Mr. Bradshaw's negligence, if any, would not prevent a recovery by the other respondents. It is conceded that the instruction correctly stated the law as far as it went, but the railroad contends that it should also have submitted to the jury the question whether Fae De Vore was contributorily negligent in failing to warn the driver in time to avoid the accident. In short, the complaint is that the jury was instructed that under no circumstances could her representatives be barred from recovery because of her contributory negligence.

In its answer, the railroad affirmatively raised the defense of contributory negligence of the guest, and if evidence had been offered to support it, the court would have been required to submit the issue to the jury. *Cox v. Polson Logging Co., supra.* However, there was no evidence directly bearing on this issue except that Fae De Vore was riding in the front seat of the car at the time of her death and

that the car was traveling in excess of the lawful speed limit. There was no evidence that she had any authoritative control over its operation or that she had any knowledge of impending danger or failed to warn the driver or that Mr. Bradshaw was driving so negligently that it could not have gone unnoticed by his passenger.

■ ■ The burden of producing such evidence was upon the railroad, and contributory negligence will not be presumed. *Gillum v. Pacific Coast R. Co.*, 152 Wash. 657, 279 Pac. 114. In the absence of any substantial evidence of negligence on the part of Fae De Vore which proximately contributed to the collision, instruction No. 5 was correctly given.

Instruction No. 7 informed the jury of the basic *rules* governing the rights of motorists and railroad operators at grade crossings. The fifth and last basic rule was followed by the statement that the only exception to the foregoing basic *rule* was where the situation at the crossing was inherently dangerous or one of such a character as to mislead a motorist exercising reasonable care. Counsel for the railroad has no quarrel with the basic rules but evidently misread the last portion of the instruction, since it is argued that the exception applied to all of the basic rules, rather than to the fifth rule only, and therefore relieved the motorist of all duties of care. When the whole instruction is correctly read in conjunction with the other instructions in the case, it cannot be said that the jury was misled by it.

The railroad assigns error to instruction No. 11, which told the jury that, if Mr. Bradshaw was warned by a signal or by seeing the engine in time to avoid the collision, then *he* could not recover. It is contended that the instruction should have stated that, if the jury so found, *none* of the respondents could recover, because there would have been no negligence on the part of the railroad. The pleadings allege two other grounds of negligence on the part of the railroad, as set out earlier in the opinion, and it would have been error to have instructed the jury that a failure to prove two of the four alleged grounds of negligence would require a verdict against all the respondents.

· Complaint is made of instruction No. 21, which informed the jury that, at the time of her death, Fae De Vore had a life expectancy of approximately forty-nine years and her husband Melvin De Vore had an expectancy of approximately forty-six years. These figures were taken from a mortality table contained in the 1952 or 1953 World Almanac and compiled by the Federal security agency. The railroad contends that this table is not a standard mortality table, and that the court should not have taken judicial notice of it.

By a 1947 statute (RCW 48.02.160; Rem. Supp. 1947, § 45.02.16), the legislature imposed upon the insurance commissioner the duty of obtaining and publishing tables showing the average expectancy of life for the use of courts and appraisers. Pursuant to this statute, the insurance commissioner has published the Commissioners 1941 Standard Ordinary Table of Mortality. Substantially the identical table is contained in 58 C. J. S. 1212. In the interest of uniformity, we suggest that the table published by the insurance commissioner pursuant to this statute should be used by the courts in guiding juries as to life expectancy.

While there is some discrepancy between the figures used in the instruction and the figures given in the approved table, we do not believe that it is sufficient to require a reversal in this case. Average life expectancy is a guide to aid the jury but is not an absolute figure in determining the life expectancy of any particular individual. *Roalsen v. Oregon Stevedoring Co.*, 147 Wash. 672, 267 Pac. 433, and case cited; *Thompson v. Seattle*, 35 Wn. (2d) 124, 211 P. (2d) 500.

Appellant argues that the trial court erred in refusing to reduce the verdict of twenty-five thousand dollars awarded to the administrator of Fae De Vore's estate for the benefit of her surviving child, Danny Fisher. While the verdict is very substantial, it must be remembered that, some years prior to the accident, the boy's father had abandoned his parental obligations, and that, as the result of this accident, the boy lost his only remaining natural parent. We cannot say that the trial court abused its discretion in de-

clining to hold that the verdict was the result of passion or prejudice, and we, therefore, will not substitute our judgment for that of the jury as to pecuniary loss suffered by an eight-year-old boy under the evidence presented in this case. *Thompson v. Seattle, supra; Kramer v. Portland-Seattle Auto Freight, ante* p. 386, 261 P. (2d) 692.

We have carefully examined the other assignments of error raised by the railroad and find that they either have been covered by what we have previously said or are without merit.

The judgment against the city of Seattle is reversed with directions to dismiss all causes of action as to it, and the judgment against the Northern Pacific Railroad Company entered upon the verdict is, in all respects, affirmed.

SCHWELLENBACH and HAMLEY, JJ., concur.

## ON REHEARING EN BANC

PER CURIAM.—Subsequent to the Departmental hearing in this cause, the above opinion was prepared and all members of the Department functioned thereon. Pursuant to the order of the Chief Justice, the cause was reheard *En Banc* with respect to the errors assigned by appellant city of Seattle only. Upon such rehearing, a majority of the court adheres to the Departmental opinion in so far as it relates to the appeal of the city of Seattle.

GRADY, C. J. (concurring in part and dissenting in part)— I concur in that part of the opinion affirming the judgment of the trial court against Northern Pacific Railroad Company, and reversing the judgment against the city of Seattle, but am not in accord with the view that RCW 47.36.060 is indefinite or uncertain or that there is anything about it with which city officials cannot conform, or that the city may not know when it is or when it is not disobeying legislative command.

The act of 1937 quoted in the majority opinion appears to have left it to the discretion of the city authorities where the traffic devices referred to should be placed and maintained in order to warn traffic of danger. The act of 1939

requires local authorities to place and maintain such traffic devices upon public highways as may be necessary to warn such traffic. It is a clear and direct mandate. Under such a statute, a city has the duty to ascertain and become aware of dangerous places and adequately warn the traveling public of their existence. If the city is charged with a nonperformance of this duty and claims that the place in question was not of such a character as to require any device to warn the traveling public, a question for the trier of fact may arise, or if the facts are not in dispute, the question may be one of law for the court to decide. No legislative standard is needed in order to enable public officers and agents to know when a place is dangerous and that a warning device is necessary.

In this case, the sole proximate cause of the accident was the negligence of appellant Northern Pacific Railroad Company when its servants propelled the locomotive onto the paved portion of the highway without adequately warning drivers of automobiles of its approach to the highway. This conclusion makes it unnecessary to determine whether or not it was necessary that the city of Seattle place a warning device at or near the intersection of the street and the railroad track where the accident occurred.

FINLEY, J. (concurring with Grady, C. J.)—I agree with the results emphasized and approved by the Chief Justice, and with his views regarding RCW 47.36.060.