[No. 42636.    En Banc.    January 31, 1974.]

FRED M. HOOPS, *as Executor, Appellant,* v. BURLINGTON NORTHERN, INC., *et al., Respondents.*

*Loney, Westland, Raekes, Rettig & Sonderman,* by *Philip M. Raekes,* for appellant.

*Delbert W. Johnson,* for respondent Burlington Northern, Inc.

*Olson & Olson,* by *Orville B. Olson,* for respondent City of Kennewick.

HAMILTON, J.—On the morning of March 18, 1970, Mrs. Virginia Ann Hoops, while driving to her place of employment, was killed in an automobile-train collision at a grade crossing, designated as the Johnson Street crossing, in the city of Kennewick, Washington. The crossing, bordered by residential areas, is one of four within a 2-mile area annexed by the City of Kennewick in July 1967. The first two crossings to the west, Columbia Center Boulevard and Edison Street, were protected by an automatic gate and flasher signals. The next two crossings, Volland Street and Johnson Street, were protected by crossbucks and stop signs. The crossbuck and stop sign at the Johnson Street crossing were mounted upon a pole, 9 inches in diameter, located approximately 10 feet 6 inches from the northerly rail of the railroad tracks. Other traffic control measures at the Johnson Street crossing included a railroad crossing advance warning sign, a "prepare-to-stop" sign and a white stop line situated approximately 10 feet 8 inches from the tracks. Vehicular traffic over the crossing was estimated to be in excess of 1,500 cars daily. The morning was clear and visibility along the tracks to the west was unobstructed for more than a half mile.

The Burlington Northern freight train, traveling from Yakima and heading east into Kennewick, consisted of 55 cars and a 6-unit locomotive, with a gross weight of ap-

proximately 9 million pounds. It was on an unscheduled run, that is, a run without designated station-to-station arrival times. It passed through the Columbia Center Boulevard, Edison Street and Volland Street crossings at an estimated speed of 65 miles per hour and maintained that speed until immediately prior to the collision. Stopping distance at such speed was reckoned to be approximately 1 mile. The speed limit for trains within the city limits of Kennewick was set at 35 miles per hour by a 1952 order of the Washington State Utilities and Transportation Commission.

Mrs. Hoops, accompanied by her 16-year-old daughter, whom she was taking to school, left her home at approximately 7:50 a.m. According to her daughter, the car windows were up, the radio was playing, and Mrs. Hoops had her seat belt fastened, although the daughter did not. Upon leaving her home and pursuing her customary route, Mrs. Hoops traveled in an easterly direction on a road paralleling the railroad right-of-way, until she turned south onto Johnson Street and the crossing which was perpendicular to the railroad tracks. She stopped at the white stop line, and according to her daughter looked both ways down the tracks, following which she proceeded ahead. Up until this time neither she nor her daughter had heard or seen the train. As the front wheels of the automobile entered upon the railroad tracks, both Mrs. Hoops and her daughter became aware of the onrushing train. Seemingly, Mrs. Hoops panicked, put on the brakes and commenced an unavailing effort to put the car in reverse at the same time telling her daughter to get out, which the girl did. A second or so later the collision occurred resulting in Mrs. Hoops' death.

The evidence is in conflict as to whether the headlight of the train was burning and whether or for what duration the train's whistle had been sounded. One witness testified that a car immediately preceded Mrs. Hoops over the crossing. Another witness, the driver of an automobile immediately behind the Hoops vehicle, stated that he did not see or hear the train and started forward with the movement

of the Hoops vehicle. A third witness, the driver of the second car behind Mrs. Hoops, testified that as he followed the route paralleling the tracks he observed the train in his rearview mirror. He further stated that, because he was in a hurry, he felt that if the cars ahead of him crossed the tracks without stopping for the stop sign, he could likewise get across.

The train crew in essence stated they were familiar with the area and with the crossings. The engineer testified that he observed the vehicles on the parallel road as they approached the crossing and noted the Hoops vehicle stop at the sign. He said he first became aware of the presence of the Hoops vehicle on the tracks when he saw the girl leaving the car, at which time he "dynamited" the brakes but could not then avoid the collision.

Plaintiff initiated this action against Burlington Northern and the City of Kennewick alleging Mrs. Hoops' death was occasioned by their negligence and willful and wanton misconduct. In his complaint against Burlington Northern, plaintiff alleged that the train was traveling in excess of the applicable speed limit of 35 miles per hour, that the train operating crew did not maintain a proper lookout or sound the train whistle prior to the accident, and that the railroad company did not install proper safety devices at the crossing, all of which amounted to negligence and willful and wanton misconduct. Plaintiff also alleged that Burlington Northern, a public service company, was strictly liable by virtue of RCW 81.04.440. As against the City of Kennewick, plaintiff alleged it to be guilty of negligence and willful and wanton misconduct because it did not enforce the train speed limit within the annexed area and did not correct the hazards existing at the crossing.

Both defendants affirmatively pled contributory negligence on the part of Mrs. Hoops, and the City of Kennewick further alleged that she was guilty of contributory, willful and wanton misconduct.

At the conclusion of the evidence, the trial court ruled that Mrs. Hoops and both defendants were guilty of negli-

gence as a matter of law. The only issue submitted to the jury was that of the alleged willful and wanton misconduct. The jury returned a verdict in favor of both defendants, and the plaintiff appeals from the judgment entered thereupon.

We are of the opinion that the trial court was correct in ruling that Burlington Northern was negligent as a matter of law and in submitting the issue of its alleged willful and wanton misconduct to the jury. Likewise, the trial court properly concluded that Burlington Northern was not strictly liable. However, we are of the view that the trial court erred in withdrawing from the jury's consideration the issues of negligence and contributory negligence as related to the City of Kennewick and Mrs. Hoops and in submitting the issues of willful and wanton misconduct as to them.

In setting forth our reasons for the conclusion reached, a threshold issue requires resolution. This issue emerges from the trial court's determination that the 35-mile-per-hour train speed limit fixed for the city of Kennewick by order of the Utilities and Transportation Commission in 1952 applied to the annexed area through which the train was passing at the time of the accident. Burlington Northern contends, and adduced some evidence in support of its contention, that the commission has for some time past administratively construed its train speed orders in second- and third-class cities and towns as being inapplicable to subsequently annexed areas. The railroad argues that the commission's interpretation of its speed orders is reasonable and that neither the trial court nor this court is at liberty to disturb such construction. We cannot agree.

■ In Laws of 1943, ch. 228, §§ 1 and 2, p. 696, codified as RCW 81.48.030[1] and RCW 81.48.040,[2] reenacted Laws of

---

[1]"The right to fix and regulate the speed of railway trains within the limits of cities of the second class, third class, and towns, is vested exclusively in the commission: *Provided*, That RCW 81.48.030 and 81.48.040 shall not apply to street railways which may be operating or hereafter operated within the limits of said cities and towns." RCW 81.48.030.

1961, ch. 14,[3] the legislature delegated to and conferred upon the Utilities and Transportation Commission the exclusive right to fix train speed limits within second- and third-class cities and towns. The force of the exercise of this authority by the commission was to abrogate and replace by the commission's order any outstanding city or town ordinance regulating train speed within the given municipality. Thus, the commission's order fixing speed in the city of Kennewick not only supplants and stands in lieu of any local ordinance regulating the subject matter, but also the order becomes as effective upon and as controlling of train speed within the city limits as though the legislature had itself fixed the speed limit for the area involved.

■ We have long recognized and held that upon annexation of new territory to a city or town such territory immediately becomes an integral part of the municipality, and ipso facto becomes subject to all the laws and ordinances then in force regulating activities within the city limits. *Seattle Lighting Co. v. Seattle*, 54 Wash. 9, 102 P. 767 (1909); *Peterson v. Tacoma Ry. & Power Co.*, 60 Wash. 406, 111 P. 338 (1910); *Ettor v. Tacoma*, 77 Wash. 267, 137 P. 820 (1914); *Western Gas Co. v. Bremerton*, 21 Wn.2d 907, 153 P.2d 846 (1944); *Evergreen Trailways, Inc. v. Renton*, 38 Wn.2d 82, 228 P.2d 119 (1951). We see no rational or reasonable basis for exempting the commission's train speed regulations from this established rule.

---

[2]"After due investigation and within a reasonable time after June 9, 1943, the commission shall make and issue an order fixing and regulaing the speed of railway trains within the limits of cities of the second class, cities of the third class, and towns. The speed limit to be fixed by the commission shall be discretionary, and it may fix different rates of speed for different cities and towns, which rates of speed shall be commensurate with the hazard presented and the practical operation of the trains. The commission shall have the right from time to time, as conditions change, to either increase or decrease speed limits established under RCW 81.48.030 and 81.48.040."
RCW 81.48.040.

[3]By Laws of 1971, ch. 143, §§ 1 and 2, p. 689, RCW 81.48.030 and .040 were amended to extend the commission's authority to grade crossings outside city limits.

The trial court correctly held that the 35-mile-per-hour train speed limit fixed for the city of Kennewick by the commission's 1952 order applied. This being so, the trial court properly concluded upon the undisputed evidence that Burlington Northern was in violation of the speed limit and was negligent per se, and that the extent of the violation gave rise to the issue of willful and wanton misconduct.

■ We turn now to the issues of negligence and contributory negligence as they pertain to the City of Kennewick and Mrs. Hoops. In considering these issues, in connection with a determination of the correctness of the trial court's order finding both parties negligent as a matter of law, each party is entitled to have the evidence viewed in a light most favorable to their respective positions. *Haft v. Northern Pac. Ry.*, 64 Wn.2d 957, 395 P.2d 482 (1964).

■ It cannot be said that a party is negligent or contributorially negligent as a matter of law where reasonable minds can differ, upon viewing the evidence, as to whether such party exercised the requisite amount of care under the circumstances. In *Stewart v. Northern Pac. Ry.*, 96 Wash. 486, 491, 165 P. 377 (1917), this court said:

> " 'It is frequently stated that, when the facts are undisputed or conclusively proved, the question of negligence is to be decided by the court. A better opinion, however, would seem to be that, in order to justify the withdrawal of the case from the jury, the facts of the case should not only be undisputed, but the conclusion to be drawn from those facts indisputable. Whether the facts be disputed or undisputed, if different minds may honestly draw different conclusions from them, the case should properly be left to the jury.' 2 Thompson, Negligence, p. 1236.

With respect to the City of Kennewick, the evidence revealed that since the 1967 annexation the city had installed the stop sign together with overhead illumination at the Johnson Street crossing, and had undertaken comprehensive planning looking toward the rerouting of traffic and the establishment of a grade-separated crossing in the vicinity of the Volland Street crossing to meet the needs of

the area. Automatic signalization had been considered, but in view of the traffic rerouting plan had been deferred. Some train speed checks likewise had been entertained. The crossing had an accident-free record and could not be characterized as extrahazardous.

In view of the advance warning signs, the stop sign, and the relatively unobstructed visibility at the crossing, we are satisfied reasonable minds could differ as to whether the city was negligent in failing to take additional steps with respect to perfecting the safety of the crossing. *Bradshaw v. Seattle*, 43 Wn.2d 766, 264 P.2d 265, 42 A.L.R.2d 800 (1953). Likewise, we are satisfied the evidence negates the contention that the actions of the city could be found to constitute willful and wanton misconduct. The trial court accordingly erred in holding the city negligent as a matter of law and in submitting the issue of willful and wanton misconduct to the jury.

In regard to Mrs. Hoops, the evidence indicated that she customarily took the route she followed on the day of the accident, thus was familiar with the crossing. The train was an unscheduled one. As Mrs. Hoops approached the crossing, she was traveling at a lawful speed and upon arrival she stopped as directed by the stop sign. The car radio was on and the windows were up. The evidence is in conflict as to whether and/or when the train whistle sounded. Her daughter did not hear the whistle during the approach and while the car was stopped at the stop sign, and the driver in the car immediately behind the Hoops vehicle did not see or hear the train until Mrs. Hoops was on the track. While stopped, Mrs. Hoops looked both ways. Whether she saw the train and misjudged its speed or didn't see it at all would be known only to her. According to one witness, a car ahead of her safely negotiated the crossing. When she reached the track with the front wheels and realized the proximity of the train, she sought to back the car off the tracks and told her daughter to get out. Her seat belt was fastened and she was on the offside of the vehicle. She could well have been in its path when the train struck had

she gotten out. Only a second or so elapsed between the time her daughter got out and the collision.

As early as *Traver v. Spokane St. Ry.*, 25 Wash. 225, 239, 65 P. 284 (1901), this court ruled that

> before a court will be justified in taking from the jury the question of contributory negligence, the acts done must be so palpably negligent that there can be no two opinions concerning them.

Viewing Mrs. Hoops' actions in the light of the surrounding circumstances, including the speed of the train and the possible lack of a timely warning whistle, we are satisfied reasonable minds could differ upon the question of her negligence or lack thereof. Certainly, it cannot fairly be said she was so palpably negligent that there could be no two opinions concerning her actions.

■ By the same token, we do not deem that the evidence as a whole is sufficient to characterize her actions as intentional or in reckless disregard of the consequences. If anything, her acts were inadvertent or negligent rather than intentional. Hence, the issue of willful and wanton misconduct upon her part should not have been submitted to the jury. *Adkisson v. Seattle*, 42 Wn.2d 676, 258 P.2d 461 (1953).

Plaintiff strenuously argues that, pursuant to RCW 81.04.440, Burlington Northern is strictly liable for plaintiff's damages because of the speed limit violation. The statute reads:

> In case any public service company shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done, either by any law of this state, by this title or by any order or rule of the commission, *such public service company shall be liable to the persons or corporations affected thereby for all loss, damage or injury caused thereby or resulting therefrom, and in case of recovery* if the court shall find that such act or omission was wilful, it may, in its discretion, fix a reasonable counsel or attorney's fee, which shall be taxed and collected as part of the costs in the case. An action to recover for such loss,

damage or injury may be brought in any court of competent jurisdiction by any person or corporation.

(Italics ours.) RCW 81.04.440.

■ We cannot agree that the statute by its language imposes strict liability or liability without fault upon public service companies. It has never been so construed since its passage in 1911. Laws of 1911, ch. 117, § 102, p. 608. The statute is couched in terms of fault and causation rather than in terms of strict or absolute liability. Upon proof of fault, it would compel a conclusion of negligence per se, not absolute liability, for proximate cause would necessarily have to be shown before a recovery could be had. Culpability of the injured party would necessarily be in issue.

The judgment of dismissal is reversed, and the cause is remanded for new trial. Costs will abide the result of the new trial.

HALE, C.J., and FINLEY, ROSELLINI, HUNTER, STAFFORD, WRIGHT, UTTER, and BRACHTENBACH, JJ., concur.